

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-5-2003

# Martini v. Hendricks

Precedential or Non-Precedential: Precedential

Docket No. 02-9005

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"Martini v. Hendricks" (2003). *2003 Decisions.* Paper 86.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/86

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed October 22, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

––––––––––

No. 02-9005

––––––––––

JOHN MARTINI, SR.,
                              Appellant

v.

ROY L. HENDRICKS, Administrator, New Jersey State
Prison; PETER C. HARVEY, Acting Attorney General, State
of New Jersey

––––––––––

On Appeal From the United States District Court
For the District of New Jersey
(D.C. Civ. No. 99-cv-04347)
District Judge: Honorable William H. Walls

––––––––––

Argued: July 8, 2003

Before: ROTH, BECKER and COWEN, *Circuit Judges.*

(Filed: October 22, 2003)

YVONNE SMITH SEGARS
Public Defender of New Jersey
MARK H. FRIEDMAN (Argued)
Assistant Deputy Public Defender
THERESA YVETTE KYLES
Assistant Deputy Public Defender
Office of the Public Defender
Department of the Public Advocate
31 Clinton Street
P.O. Box 46003
Newark, NJ 07101

ALAN L. ZEGAS
PATRICIA A. LEE
552 Main Street
Chatham, NJ 07928

*Counsel for Appellant*

JOHN L. MOLINELLI
Bergen County Prosecutor
CATHERINE A. FODDAI (Argued)
Assistant Prosecutor
Bergen County Justice Center
Hackensack, NJ 07601

*Counsel for Appellees*

## OPINION OF THE COURT

BECKER, *Circuit Judge*:

This is an appeal from the order of the District Court denying the petition of John Martini, Sr. for a writ of habeas corpus brought pursuant to 28 U.S.C. § 2254(a). Martini was convicted of first-degree murder and related offenses in connection with the disappearance and death of Irving Flax, a Fairlawn, New Jersey businessman. Flax was forcibly taken from his home by Martini and his then-girlfriend, Therese Afdahl. The pair demanded ransom money from Flax's wife and although Mrs. Flax paid the money, Martini murdered Flax by three pistol shots to the back of the head, and left his body in a parking lot. It was not disputed that Martini committed the crime; rather, the defense challenged the state's claim that he acted purposely or knowingly, adducing evidence that Martini's capacity was diminished by serious and long-standing addiction to cocaine. The jury rejected that defense at both the guilt and penalty phases of the trial, and Martini was sentenced to death. Martini seeks to overturn his sentence, alleging, *inter alia*, that a potential juror was improperly dismissed for cause in violation of *Witherspoon v. Illinois*, 391 U.S. 510 (1968), and also that the trial court improperly answered a jury question regarding the permissible use of mitigating

evidence, the two issues on which we granted a Certificate of Appealability ("COA").

We have no difficulty with the latter point, and reject Martini's contention. The former issue is, however, close and difficult with respect to juror Ronald Vladyka (though not with respect to two other jurors with respect to whom a COA was not issued). Martini presents a forceful argument that the ability of juror Ronald Vladyka to follow the trial Court's instructions as to the penalty phase was not substantially impaired, and that he should have been seated on the jury. We conclude, however, that Martini has failed to meet the rigorous standard of 28 U.S.C. § 2254(e)(1) for rebutting, by clear and convincing evidence, the presumption of correctness of the finding of the state trial judge, affirmed by the New Jersey Supreme Court, that Vladyka's ability was substantially impaired, and hence we will affirm the order of the District Court.

## I.  Procedural History; Standard of Review

After a Bergen County, New Jersey jury convicted Martini of the 1990 Flax kidnapping and murder, the New Jersey Supreme Court upheld the conviction and death sentence on direct appeal. *State v. Martini*, 131 N.J. 176, 619 A.2d 1208 (1993). Although Martini was initially scheduled to be executed in 1995, the public defender successfully sought a stay and in the ensuing years has filed several appeals alleging, *inter alia*, psychiatric incompetence to waive post-conviction relief proceedings, ineffective assistance of counsel, and violation of Martini's *Brady* right to exculpatory evidence. The New Jersey Supreme Court affirmed the trial court's denial of post-conviction relief on each of these grounds. *State v. Martini*, 139 N.J. 3, 651 A.2d 949 (1994); *State v. Martini*, 144 N.J. 603, 677 A.2d 1106 (1996); *State v. Martini*, 148 N.J. 453, 690 A.2d 603 (1997); *State v. Martini*, 160 N.J. 248, 734 A.2d 257 (1999).

Martini then sought a writ of habeas corpus in the District Court for the District of New Jersey under 28 U.S.C. § 2254, challenging his death sentence on seven grounds listed in the margin.[1] The District Court denied the

---

1. Martini asserted: (1) ineffective assistance of counsel for failure to investigate and use at trial certain mitigating evidence; (2) ineffective

petition in all respects. Although Martini sought relief on all seven grounds, we granted a COA on only the two referenced above. The District Court had jurisdiction pursuant to 28 U.S.C. §§ 2241 and 2254, and we exercise appellate jurisdiction under 28 U.S.C. §§ 2253 and 1291. Although our review of the District Court's decision is plenary, *Marshall v. Hendricks*, 307 F.3d 36, 50 (3d Cir. 2002), under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") and the Supreme Court's decision in *Williams v. Taylor*, 529 U.S. 362 (2000), we must deny federal habeas corpus relief to any claim which was adjudicated on the merits in a state court proceeding unless such adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. §§ 2254(d)(1) and (2) (2001).

In this statutory scheme of legal deference, only the unreasonable determination prong of § 2254(d)(2) is potentially applicable to Martini's *Witherspoon* claim. *See,*

---

assistance of counsel for failure to locate and produce drug paraphernalia in the guilt and penalty phases; (3) violation of due process rights stemming from the prosecution's failure to turn over mitigating evidence discoverable under *Brady v. Maryland*; (4) violation of due process rights and right to an impartial jury for the wrongful exclusion of prospective jurors; (5) subjection to cruel and unusual punishment because of the trial court's refusal to instruct the jury that Martini rendered substantial assistance to the state in the prosecution of another person for the crime of murder; (6) violation of due process rights to a reliable sentencing proceeding and subjection to cruel and unusual punishment because of the trial court's allegedly erroneous answer to the jury's question regarding mitigating evidence; and (7) denial of due process rights because of the state court's refusal to admit expert testimony during the post-conviction relief hearing. *Martini v. Hendricks*, 188 F. Supp. 2d 505 (D.N.J. 2002).

*e.g., Kinder v. Bowersox*, 272 F.3d 532, 543-44 (8th Cir. 2001). Also relevant to the analysis is § 2254(e)(1):

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court, shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

*See Wiggins v. Smith*, 123 S. Ct. 2527, 2539 (2003) (applying the standard).

## II. Wrongful Exclusion of a Prospective Juror

### A.

During *voir dire*, 209 persons were individually questioned by the court and counsel. Over defense counsel's objection, the trial court excluded for cause prospective juror Ronald Vladyka because the court believed that his answers to the prosecutor's and public defender's questions demonstrated that he would have substantial difficulty voting for the death penalty. Martini argues that Vladyka's exclusion constitutes an unreasonable determination of the facts in light of the evidence presented in state court. As we have explained elsewhere, "*Witherspoon*'s holding is grounded in the right to a fair and impartial jury guaranteed to state criminal defendants by the Sixth and Fourteenth Amendments, and thus veniremen can be excluded based on their views on capital punishment only if they would be biased and lack impartiality in hearing the case." *Szuchon*, 273 F.3d at 327. A trial court's conclusion that a potential juror would be biased is a factual determination, *see id.* at 330, and it is therefore entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1).

It is clear that potential jurors may not be excused for cause "simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Witherspoon*, 391 U.S. at

522. Instead, the Supreme Court has explained that the standard for exclusion is whether a potential juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 433 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)). It emphasized that the determination of juror bias is a factual one that need not be proven with "unmistakable clarity." *Id.* at 424. In this type of case, it is crucial to examine the transcript in detail. Although we will discuss relevant portions of it in this opinion, because the reader may find it useful, we have attached the entire transcript, which is relatively short, as an appendix to this opinion.

It is beyond dispute that Vladyka was personally opposed to the death penalty:

> Q.   Do you have any feelings or beliefs about the death penalty?
>
> A.   I don't believe in it.
>
> Q.   Under any circumstances?
>
> A.   Well, I just — I don't know. I just don't believe in it. I can't really give a reason why.
>
> Q.   Do you think there are any crimes where the death penalty is an appropriate penalty?
>
> A.   Well — no.
>
> Q.   None at all?
>
> A.   No, not really.

(JA45-46).

The law, however, is clear that mere personal opposition to the death penalty is not cause for exclusion if the prospective juror would nevertheless be able to follow his oath and apply the death penalty if the facts and law required. *See Szuchon*, 273 F.3d at 329 (holding improper the removal of a prospective juror for cause where the court found "no evidence that [his] lack of belief in capital punishment would have prevented or substantially impaired his ability to apply the law"). The Court, the defense counsel, and the prosecutor all questioned Vladyka

as to the extent to which his personal views might inhibit his ability to vote to impose capital punishment. We will detail Vladyka's responses.

The Court proceeded first:

> Q. Do you feel that your beliefs about the death penalty would adversely affect your ability to fairly and impartially determine guilt or innocence?
>
> A. No.
>
> \* \* \*
>
> Q. As a sworn juror — would you be able to weigh the [aggravating and mitigating] factors, the evidence on both sides, apply the principles of law as I explain, and if the facts warranted — would you be able to vote to impose the death penalty?
>
> A. That's a hard situation. You know, you don't know the facts, okay.
>
> Q. That's what I've said; you don't know the facts, but let's assume there are no mitigating factors, only aggravating factors, or the aggravating factors . . . outweigh the mitigating factors to such a degree that based on the law, as I explain it, you have no choice?
>
> A. Can I —
>
> Q. Would you be able to vote to impose the death penalty?
>
> A. Yes, sir.

(JA46-47.) The public defender then questioned Vladyka:

> Q. The issue really is regardless of how you feel about the death penalty, and you seem to be adverse to it, can [you] mechanically follow instructions with some thought if the Judge says "You've got to make a certain decision regardless of how reluctant you may feel to do so," can you follow the law as the Judge gives it to you?
>
> A. Yeah, sure.
>
> \* \* \*

Q. It may be that some of the mitigating factors the Judge may let you hear and we don't know. We're a week away, maybe John's age could be that he was acting strangely about the time of the incident, not so strange as to be a defense because you've already decided he's guilty but strange enough to argue that he should go to jail for 30 years instead. You may hear some testimony that he was using illegal drugs, not to forgive him because you decided he did it but as mitigating factors to argue that he should do 30 years instead of life. Can you make that weighing process?

A. Yes, I think so, sure.

(JA48-50.) The prosecutor then asked Vladyka:

Q. Were you surprised to hear what kind of case it was?

A. Yes.

Q. And your thoughts up until then were that you individually were opposed to the death penalty; is that correct?

A. Yes.

Q. Knowing that that's your feeling, do you really think you'd be able to sit and listen to the evidence if we get to the penalty phase, listen to the evidence and give the State a fair shot? In other words, would you be able to consider imposing the death penalty?

A. I guess so.

Q. So your feelings aren't that strong that it would prevent you from —

A. No, not really, either way.

Q. Because it's not going to be a hypothetical situation anymore. You're going to be dealing with the life of a real human being. Can you make that weighing process and would you be able to say in open Court John Martini should get the death penalty?

THE COURT: If the facts warranted.

Q. If the facts warranted?

9

THE COURT:   And that's what the jury found?

A.   I don't know.

Q.   I know it is a hard question.

A.   It's a hard question.

Q.   So you really can't say?

A.   Not really.

(JA51-52.)

The public defender then sought to rehabilitate Vladyka:

Q.   The real question that we have to know is: Can you do both, having made the weighing process of aggravating and mitigating factors, are you capable in the proper circumstances to send John [Martini] to death row?

A.   I guess if everything was in place and I believed in it, I mean, you know it is hard to say yes or no.

*   *   *

Q.   Let's assume that there is no proof to some extent of mitigating circumstances, but there is proof only of aggravating circumstances. It's a drastic example, but it is a possibility. Knowing that only aggravating circumstances are in and let's say the law is and the judge tells you that if there is no proof of mitigating circumstances, you really have no decision as a juror and he should die, could you do that?

A.   I guess so.

Q.   Okay. Now when you say "I guess so," and that's a problem. Does that mean yes, reluctantly yes?

A.   Yes.

Q.   Knowing the man's life is at stake, you have got to make a decision, you could could [*sic*] that?

A.   I guess so, sure.

(JA52-54.)

Finally, the Court asked:

THE COURT:  If maybe you are the Foreperson, if he is the Foreperson, would you be able to announce that verdict in open court?

A.  No.

THE COURT:  Thank you, sir. I'm going to excuse you.

(JA54-55.)

## B.

Vladyka's responses to certain questions surely create considerable doubt as to whether he could separate his personal beliefs (his opposition to the death penalty) from the task at hand. In response to the prosecutor's question: "Can you make that weighing process and would you be able to say in open Court John Martini should get the death penalty?," Vladyka answered "I don't know . . . it's a hard question." (JA51-52.) Similarly, when asked: "are you capable in the proper circumstances to send John [Martini] to death row?," he replied, "I guess if everything was in place and I believed in it, I mean, you know it is hard to say yes or no." (JA53.) He also intimated that he could render a decision only "reluctantly." (JA53.)

On the other hand, when asked: "Would you be able to vote to impose the death penalty?" Vladyka answered, "Yes, sir." (JA47.) He also confirmed in at least six other places, with various degrees of conviction, that he would be able to engage in the weighing process and would be able to vote for death if the facts warranted:

Q.  Can you follow the law as the judge gives it to you?

A.  *Yeah, sure.* (JA48-49) (emphasis added).

*   *   *

Q.  You may hear some testimony that he was using illegal drugs, not to forgive him because you decided he did it but as mitigating factors to argue that he should do 30 years instead of life. Can you make that weighing process?

A.  *Yes, I think so, sure.* (JA50) (emphasis added).

\* \* \*

Q. [D]o you really think you'd be able to sit and listen to the evidence if we get to the penalty phase, listen to the evidence and give the State a fair shot? In other words, would you be able to consider imposing the death penalty?

A. *I guess so.*

Q. So your feelings aren't that strong that it would prevent you from —

A. *No, not really, either way.* (JA51) (emphases added).

\* \* \*

Q. Knowing that only aggravating circumstances are in and let's say the law is and the judge tells you that if there is no proof of mitigating circumstances, you really have no decision as a juror and he should die, could you do that?

A. *I guess so.* (JA53) (emphasis added).

Q. Knowing the man's life is at stake, you have got to make a decision, you could could [*sic*] that?

A. *I guess so, sure.* (JA53-54) (emphasis added).

The inevitable question is how to interpret the "I think so's" and the "I guess so's," which constitute the bulk of Vladyka's affirmative responses to the effect that he could vote to impose the death penalty. If we were to translate them into a solid "yes," we might be constrained to say that while Vladyka was impaired in his ability to follow the Court's instructions, he was not "substantially impaired," under the *Witherspoon* standard, and hence he should have stayed on the jury. There are, however, two problems with that analysis. First, the state trial judge, who saw and sized up Vladyka, and who on one occasion had to ask him to speak up, observed his frequent tentative responses and was obviously of the view that "I think so" and "I guess so" were not affirmative but equivocal. Under AEDPA that evaluation is entitled to a very substantial deference. Moreover, the exercise of line-drawing between impaired

and substantially impaired seems highly tenuous under the AEDPA standard of review.

## C.

We note that Vladyka's strongest statement of conviction was only when the questions posed him posited that "he had no choice." *See supra* at 7. Immediately afterward, however, in response to the prosecutor's question whether he would be able to vote for the death penalty, he was entirely noncommittal:

> Q. Because it's not going to be a hypothetical situation anymore. You're going to be dealing with the life of a real human being. Can you make that weighing process and would you be able to say in open Court John Martini should get the death penalty?
>
> THE COURT: If the facts warranted.
>
> Q. If the facts warranted?
>
> THE COURT: And that's what the jury found?
>
> A. I don't know.
>
> Q. I know it is a hard question.
>
> A. It's a hard question.
>
> Q. So you really can't say?
>
> A. Not really. (JA51-52.)

The trial judge's estimate of Vladyka seems also to have been informed by the stated unwillingness to announce the verdict as foreperson in open court. We will assume that a juror has no obligation to serve as foreperson. *Alderman v. Austin*, 663 F.2d 558, 563 (5th Cir. Unit B 1981), *reinstated en banc*, 695 F.2d 124 (1983).[2] Indeed, a stated inability to

---

2. In *Alderman*, the prosecutor asked each prospective juror to describe his or her views on capital punishment. Several indicated that they would be able to impose the death penalty if warranted. The prosecutor then asked those jurors whether, if called upon to act as foreperson, they could sign their name to the verdict. Three jurors stated that despite their willingness to vote for a death sentence in an appropriate

read a guilty verdict in open court might simply reflect a potential juror's private nature or fear of making controversial statements in public. That does not mean, however, that the trial court could not consider it along with the other indicia of Vladyka's ability to follow the court's instructions.[3] *See, e.g., State v. Johnson*, 22 S.W.3d 183, 187 (Mo. 2000); *Isaacs v. State*, 386 S.E.2d 316, 328-29 (Ga. 1989).

### D.

We do not gainsay that Martini has made a plausible argument that, while Vladyka may have been somewhat impaired in his ability to follow the Court's instructions, he was not "substantially impaired," as *Witherspoon* requires.

---

case, they would not sign the verdict form. Based on these responses, the state successfully moved to strike each of the three jurors for cause. *Id.* at 562-63.

The Fifth Circuit rejected the state's argument that a juror's unwillingness to serve as a foreperson constituted a view on capital punishment that would prevent or substantially impair the juror's duties under *Witherspoon. Id.* at 563. The Court noted that it knew of "no Georgia law requiring any juror to serve, against his will, as foreman of the jury in any case." *Id.* Reviewing the record, the court found nothing to suggest that the jurors would not apply the law as instructed, *id.*, and it therefore held that "[w]hether a venireman could sign, in good conscience, a verdict that would result in a defendant's execution is immaterial to jury service under *Witherspoon.*"

We note that *Alderman* was decided before the enactment of AEDPA (and, for that matter, before the Supreme Court refined the *Witherspoon* standard in *Witt*). After AEDPA, federal habeas courts owe greater deference to the conclusions of state courts, and the relevant question is how the state courts utilized *Supreme Court*, not circuit court, precedent. *See, e.g.*, *Williams*, 529 U.S. at 412; 28 U.S.C. § 2254(d). Because no Supreme Court precedent addresses a potential juror's unwillingness to serve as the foreperson, the issues decided in *Alderman*, assuming they were correctly decided at the time, might be resolved differently in a case governed by AEDPA.

3. Under New Jersey procedure, if the jury were polled, something always done in death penalty cases, Vladyka would have had to announce his own verdict.

But we are constrained by our standard of review. We cannot say by clear and convincing evidence that the state trial judge, who saw Vladyka and doubtless "sized him up," was incorrect in his finding.

The order of the District Court denying the petition for a write of habeas corpus will therefore be affirmed.

### III. The Trial Court's Answer to the Jury's Question

We also granted a COA to consider "whether the trial judge's answer to a question for the jury during its penalty-phase deliberations resulted in punishment imposed in violation of the Eighth Amendment." To succeed on the claim, Martini would need to show that the state courts' rejection of this claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). *See Williams*, 529 U.S. at 407-11.

At the penalty phase, the State sought to prove the existence of two aggravating factors—that the murder of Flax was committed for the purpose of escaping detection and that the murder was committed in the course of kidnapping. *See* N.J. STAT. ANN. §§ 2C:11-3(c)(4)(f), (c)(4)(g). Martini sought to show the existence of five mitigating factors, including that he acted under a diminished capacity due to mental disease or intoxication. *See* N.J. STAT. ANN. § 2C:11-3(c)(5)(d). In the course of his penalty-phase case, Martini called two mental health experts, Diana Aviv and Harvey Musikoff, in support of his argument. *See Martini*, 619 A.2d at 1222. (Martini had also called a psychiatrist, Daniel Greenfield, as a part of his diminished-capacity defense in the guilt phase. *See id.* at 1220-21.) During its penalty-phase deliberations, the jury sent a note to the trial judge asking:

> (A) Are the expert witnesses' written reports available or (B) are we only to consider their testimony for mitigating factors?

*Id.* at 1280. Over Martini's objection, the trial judge answered as follows:

> Ladies and gentlemen, [the written reports] are not available. Only those items that were admitted into evidence are available to you. You'll have to rely on your recollection of the testimony with reference to what was contained in the reports.
>
> . . .
>
> [As to the testimony of the experts,] [t]hey were presented as far as Ms. Aviv, Dr. Musikoff, their testimony was presented to establish mitigating factors. You can utilize also Dr. Greenfield's testimony if you see that supporting any mitigating factors. That's what they were presented for and that's how you're to consider their testimony for those purposes.

*Id.* at 1281.

Martini argued that the latter part of the trial court's response to the question erroneously limited his right to have the jury utilize the experts' testimony when determining whether the two alleged aggravating factors existed. The New Jersey Supreme Court concluded that the trial judge's response was "ambiguous" and, read in isolation at least, "may have caused prejudice." *Martini*, 619 A.2d at 1281. It noted that Martini was entitled under state law to have the experts' testimony used, *inter alia*, to weaken the State's case as to the aggravating factors and to figure into the balancing of any aggravating factors against any mitigating factors. *Id.* at 1282. Nevertheless, the court concluded that, examining all of the penalty-phase instructions as a whole, the trial court's response did not inhibit the jury's ability to utilize fully the experts' testimony in mitigation. *Id.*

The Eighth and Fourteenth Amendments require that the sentencer, in a capital case, "not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant offers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (emphasis in original); *see also Penry v. Johnson*, 532 U.S. 782, 797 (2001) (noting that the question is whether the jury was able to "consider and give effect to [a defendant's mitigating] evidence") ("*Penry II*").

"However, the state may shape and structure the jury's consideration of mitigation so long as it does not preclude the jury from giving effect to any relevant mitigating evidence." *Buchanan v. Angelone*, 522 U.S. 269, 276 (1998). The standard for determining if the state has violated the Eighth Amendment by precluding evidence asks whether there is a "reasonable likelihood that the jurors . . . understood the challenged instructions to preclude consideration of relevant mitigating evidence proffered by the petitioner." *Id.* at 279 (quoting *Boyde v. California*, 494 U.S. 370, 386 (1990)). Martini argues that the trial judge's answer to the jury's question about the experts' reports transgressed these principles.

We agree with the New Jersey Supreme Court, as well as the District Court, that the trial judge's response to the jury's question was far from ideal. *See Martini*, 619 A.2d 1281; *Martini*, 188 F. Supp. 2d at 529. Certainly, in isolation, the judge's answer might reasonably have been understood to limit the jury's consideration of the experts' testimony to the determination whether Martini could show the existence of any mitigating factors. We note, in particular, that the jury had been instructed in great detail regarding how different categories of evidence—including evidence submitted by Martini at the guilt phase as well as evidence submitted by the State during rebuttal—could be used in the penalty deliberations. (JA553-54.) In this context, it is conceivable that the jury's question legitimately sought an answer regarding whether the experts' testimony, among all the different categories of evidence, was to be used in determining mitigation, aggravation, or both. If so, the trial judge's response incorrectly suggested that the testimony could not be used to question whether the State had proved the existence of any aggravating factor.

A constitutional violation occurs under *Lockett* and *Penry II*, however, only when the sentencer is "precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant offers as a basis for a sentence less than death." *Lockett*, 438 U.S. at 604; *see also Penry II*, 532 U.S. at 797. Recognizing this,

the New Jersey Supreme Court concluded that any misstatements of state law in the trial judge's answer to the jury's question did not constitute constitutional error under these applicable Supreme Court precedents. *Martini I*, 619 A.2d at 1281. We agree. There is no question that the jurors were repeatedly told, clearly and correctly, (a) how to find mitigating circumstances and (b) that they were free to consider the experts' testimony when determining the existence of mitigating circumstances. *See id.* at 1282; *see also id.* at 1281 (noting Martini's concession, on direct appeal, that he was relying on "a very refined distinction"). Furthermore, as the New Jersey Supreme Court indicated, the "disputed response to the jurors' inquiry did nothing to inhibit the proper use of mitigating evidence during the process of weighing the aggravating factors found to exist against the mitigating factors so found." *Id.* at 1282. At worst, the trial judge's answer may have affected the jurors' ability to consider the experts' testimony when deciding whether the State had made its case as to any *aggravating* factors. *Lockett* and *Penry II* do not speak to that issue. (Indeed, the Supreme Court has indicated that States are free to "structure the jury's consideration of mitigation so long as it does not preclude the jury from giving effect to any relevant mitigating evidence." *Buchanan*, 522 U.S. at 276.) Given that, we cannot conclude that the state courts' failure to extend *Lockett* and its progeny to this situation "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *see also Williams*, 529 U.S. at 409-11.

We also note that not a single juror found, as a mitigating factor, that Martini's crime had been committed while his capacity to appreciate the wrongfulness of his conduct was significantly diminished due to mental disease or intoxication. *Martini I*, 619 A.2d at 1222; *see also* N.J. STAT. ANN. § 2C:11-3(c)(5)(d). As the experts' testimony was universally unpersuasive on this issue, the issue which it addressed most directly, we find it extraordinarily unlikely that this testimony—assuming the jurors did not feel free to consider it for that purpose—could have persuasively undercut the State's case in any way as to either of the two aggravating factors. Indeed, once the case for diminished

capacity was rejected, the relationship between the aggravating factors—whether the murder was committed in the course of kidnapping or whether it was committed for the purpose of escaping detection—and the experts' testimony was more than a bit attenuated. We cannot conceive that jurors who did not believe Martini acted under a diminished capacity would have doubted that he was able to form the intent necessary to commit his crime to escape detection as a part of the kidnapping plan.

We note as well that six jurors found the existence of the so-called catch-all mitigating factor. *See* N.J. Stat. Ann. § 2C:11-3(c)(5)(h). To the extent, if any, that the experts' testimony figured into these jurors' determinations, no harm could possibly have accrued to Martini. Even under the jury instructions as he believes the jury understood them, these six jurors were free to balance the mitigating circumstance against the aggravating circumstances that the jury had found. As a practical matter, we see little difference between (a) a juror's consideration of the experts' testimony as rebuttal to the State's case as to aggravating factors and (b) a juror's balancing, at a subsequent step, this same testimony as mitigating evidence against those same aggravating factors. (For the reasons given in the preceding paragraph, we think that the remaining six jurors, who did not find the existence of even the catch-all factor, would not have been moved by the experts' testimony even if they were discouraged from considering it as rebuttal to the State's case as to aggravating factors.) Accordingly, we believe that even if any constitutional error might be discerned in this case, it would be harmless beyond a reasonable doubt. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *Marshall*, 307 F.3d at 73 n.25 (noting that the *Brecht* standard of harmlessness would apply in a circumstance such as this).

Finally, Martini criticizes the state courts as well as the District Court for not addressing "the separate but closely-related argument" that the trial judge's answer caused a violation of the rule of *Skipper v. South Carolina*, 476 U.S. 1 (1986). (Martini's brief, 25.) We question whether Martini fairly raised *Skipper* as a "separate but closely-related argument" in the District Court. The case was not invoked

in the habeas petition itself and was referenced, in relation to the claim about the jury's question, only in a footnote of the habeas memorandum (as simply an example of *Lockett*-type error). (Habeas Memorandum, 117 n.31.) For that reason, it was also arguably outside the scope of the COA that we issued. *See United States v. Garth*, 188 F.3d 99, 105 n.7 (3d Cir. 1999) (noting that we do not normally reach issues first pressed on appeal). At all events, *Skipper* simply held that South Carolina erred by refusing to allow a defendant to present certain mitigating evidence, the testimony of witnesses who saw the defendant's post-incarceration behavior. *Skipper*, 476 U.S. at 8. It did not hold that a defendant has a right not only to offer mitigation evidence but also to have the jury consider that evidence when determining whether the State has made out a case for an aggravating factor. *See id.* at 4 (stating that the question of the case was only whether the particular evidence was mitigation evidence under *Lockett*). At all events, even if *Skipper* stated some broader constitutional rule than *Lockett* and *Penry II*, we would find any error harmless for the reasons that we just recounted.

## IV.  Conclusion

For all the foregoing reasons, the order of the District court denying Martini's petition for a writ of habeas corpus will be affirmed.

## Appendix

〕 7 ㄱ

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION - BERGEN COUNTY
INDICTMENT NO.  S-653-89
App. Div. A- ㅎﾉ, 9ㄱﾋ

STATE OF NEW JERSEY,

vs.                                              TRANSCRIPT

                                                     OF
JOHN MARTINI, SENIOR,
        Defendant.                           JURY VOIR DIRE

_____                      Morning Session

B E F O R E:

        THE HON. BRUCE A. GAETA, J.S.C.
        BERGEN COUNTY COURT HOUSE
        HACKENSACK, NEW JERSEY
        November 1, 1990


A P P E A R A N C E S:


        BERGEN COUNTY PROSECUTOR'S OFFICE
        BY:  MARILYN GOCELIAK ZDOBINSKI, ESQ.,
        For the State.

        RICHARD C. GERNERT, ESQ. and
        KENNETH VAN RYE, ESQ.
        For the Defendant Martini.

        ROSALYN LINDNER, Jury Analyst

        JAMES KILPATRICK, ESQ.
        Assigned Investigator

ORDERED BY:

        Mark H. Friedman, Esq.


                    JANET A. SANDGRAN, C.S.R.
                     OFFICIAL COURT REPORTER
                          Lic. #639
                  COMPUTER AIDED TRANSCRIPTION

I N D E X

| JUROR | Court | Zdobinski | Gernert |
|---|---|---|---|
| Shanker, Q-178 | 3 | | |
| Silang, Q-179 | 4 | | 10 |
| Vladyka, Q-180 | 12 | 23,27 | 20,25 |
| Deberarais, Q-182 | 30 | | |
| Laux, Q-184 | 37 | | |
| Rochester, Q-185 | 39 | | |
| Firestein, Q-186 | 45 | | |
| Maffetone, Q-188 | 50 | | |
| Pleuss, Q-189 | 54 | | |

**Ja 38**

22

Silang - Gernert                                    12

excused.

            ( The witness leaves the witness stand.)

            THE COURT:  Ronald Vladyka, Q-179, #3726

            MR. GERNERT:  Q-180, Judge.

            THE COURT:  I'm sorry.  Q-180.

R O N A L D   V L A D Y K A, Q-180, #3726, first having been

duly sworn, testifies as follows:

EXAMINATION BY THE COURT:

    Q    Mr. Vladyka, you are a Department Supervisor for a
chemical company?

A    Yes.

    Q    What are your duties as supervisor?

A    I handle different men and get the work out, scheduled
work.

    Q    You're not a chemist or involved with that end of it?

A    No, I'm not.

    Q    All right.  Thank you.  Do you know any of parties
involved in this case, the attorneys, the investigator, the
prosecutor, anyone?

A    I may know one attorney, I may.

    Q    Who is that?

            MR. GERNERT:  He's pointing at me, Judge, and I assume
that's who he means.

    Q    Mr. Gernert?

A    Yes, I think so.  I think I met him a few years ago.

Vladyka - Court                                                    13

THE COURT:  Do you recall meeting with the juror?

MR. GERNERT:  No, Judge, I don't.

Q    Could you tell us the circumstances?

A    It was at a gathering, I'm not sure, maybe if I ask him a few questions, I might know.

THE COURT:  All right.

A    He owns a car.  I forget the name of the car, Avanti.

MR. GERNERT:  Yes.

A    Don Petroski.

MR. GERNERT:  Right.

A    I work for Don Petroski.

MR. GERNERT:  He's the president of Air Brook Limousine.

THE COURT:  And you represent Air--

MR. GERNERT:  Yes, and he had an Avanti dealership and only he would know to to know that I had an Avanti and I sold it sometime ago, and I had it three or four years.

Q    WHAT did you do, talk to him?

A    I met him through business and the company that I work for at that time, and I met him at a gathering at one time.

MR. GERNERT:  Christmas party or something?

MR. VLADYKA:  Yes.

Q    Do you feel that would affect your ability to be a fair and impartial juror in this case?

A    I don't think so.

Vladyka - Court                              14

MR. GERNERT:  Thank you.

Q    Do you know any relatives or close friends that have ever been employed with or associated with law enforcement; you answered yes to it?

A    I have a cousin just retired from the Saddle Brook Police Force.

Q    Ever talk to him about his work or--

A    Occasionaly.

Q    Or the cases?

A    No, no cases.

Q    In general about the police officers?

A    Just in general.

Q    Would that fact enter into your judgment in any way or affect your ability to fairly and impartially sit as a juror in this case?

A    I don't think so.

Q    Have you read anything about this case?

A    If this is the one I'm thinking about, I know a little bit about it, I think if this is the one.

Q    And how did you come upon that knowledge?

A    Well, the people that were involved in that list of names I think.

Q    Do you know anyone on that list?

A    No, I don't know anybody on the list, but the patrol officers that were all involved, it was Paramus and Fort Lee

and--

Q    All right.  Tell me what you think you know?

A    I think this happened at the Bergen Mall and something about the Paramus Police had came in and missed whatever and apparently wound up in Fort Lee.  This is about all I know.

Q    Any other details?

A    That's about it that I remember.

Q    All right.  You understand that the jury's verdict must be based solely on the evidence presented in this courtroom?

A    Yes.

Q    Would you be able to put aside what you may have read or heard and decide the case if you based it solely on the evidence presented in this courtroom?

A    I think so.

Q    Let's assume that during the course of the testimony something is said-- some of the testimony triggers your recollection and you start remembering more about what you read, would you be able to put that aside and decide the case solely on the evidence presented in this courtroom?

A    I think so.

Q    Now, you understand-- well, there was a question here. Would you give the testimony of a medical expert psychiatrist or psychologist more weight, less weight or evaluate it like any other witness?

Vladyka - Court                                    16

A    Like any other witness.

Q    Do you understand that Mr. Martini is presumed
innocent until proven guilty beyond a reasonable doubt?

A    Yes.

Q    Do you also understand that it is the State's burden
to prove his guilt beyond a reasonable doubt?

A    Yes.

Q    Do you understand that there's no burden imposed upon
him at all, he is not obligated to prove his innocence?

A    Yes.

Q    Do you accept that proposition?

A    Yes.

Q    Because you answered no on the questionnaire.

A    I probably missed it.

Q    Do you think you misunderstood?

A    Probably.

Q    But, do you accept the proposition as a principle of
law that the State always has the burden to prove the case
beyond a reasonable doubt?

A    Yes, I would say so.

Q    Do you understand that no burden is imposed on the
defendant and that he's not obligated to prove his innocence;
do you understand that?

A    Yes.

Q    All right.  The last question in the questionnaire

was:  The purpose of questioning tentative jurors is to select a jury which is free from prejudice and is fair and impartial. The question was asked, "Do you know of any reason, perhaps not covered by the questions you've been asked, why you would be unable to listen to the evidence in this case and reach a fair and impartial verdict?"  And you answered.  "Yes."

Is there any reason why you could not fairly and impartially sit as a juror and reach a fair and impartial verdict?

A    I don't think so.

Q    Do you think think so.  You put yes because you said yeah, I can do that?

A    Probably.

Q    Can you do that?

A    Sure.

Q    There's no question about that?

A    No.

Q    Do you understand from what I told all the jurors last week that there could be two parts to this trial; do you recall that?

A    No, I don't.

Q    There could be two parts to this trial, and I'll go over that and I explained it briefly last week.  The first part is what we call the guilt or innocence phase.  Evidence is presented to the jury, the jury must determine that the State

Vladyka - Court          18

has proven Mr. Martini's guilt beyond a reasonable doubt. The jury is not satisfied that the State has done that and returns a verdict of not guilty and--or whatever. The jury function is over; do you understand?

A    Uh-huh.

Q    However, if the jury determines that Mr. Martini is in fact guilty of murder, that the State's established his guilt beyond a reasonable doubt, we go on to a second hearing, the same jurors. The jurors would listen to additional testimony, additional evidence and then they would have to deliberate to determine what penalty to impose. The jurors would have one of two choices, life in prison without parole for 30 years or the imposition of the death penalty, do you understand that?

A    Yes.

Q    Do you recall me going over that with you for the last week?

A    Yes.

Q    Do you have any feelings or beliefs about the death penalty?

A    I don't believe in it.

Q    Under any circumstances?

A    Well, I just -- I don't know. I just don't believe in it. I can't really give a reason why.

Q    Do you think there are any crimes where the death penalty is an appropriate penalty?

29

A    Well-- no.

   Q    None at all?

A    No, not really.

   Q    If you were selected as a juror, you would have a sworn duty to perform; that would be to listen to the evidence and render a fair and impartial verdict in accordance with the instructions given to you by the Court; do you understand that?

A    Uh-huh.

   Q    Do you feel that your beliefs about the death penalty would adversely affect your ability to fairly and impartially determine guilt or innocence?

A    No.

   Q    As a a sworn juror if the jury were to find the defendant guilty of murder, he would be hearing evidence from the State we call aggravating factors; the defense would be presenting mitigating factors.  I would explain the principles of law that you're to apply.  As a sworn juror, would you be able to weigh those factors, the evidence on both sides, apply the principles of law as I explain, and if the facts warranted, this is hypothetical, if the facts warranted, would you be able to vote to impose the death penalty?

A    That's a hard situation.  You know, you don't know the facts, okay.

   Q    That's what I've said; you don't know the facts, but let's assume there are no mitigating factors, only aggravating

factors, or the aggravating factors are so-- outweigh the

mitigating factors to such a degree that based on the law, as I

explain it, you have no choice?

A    Can I--

     Q    Would you be able to vote to impose the death penalty?

A    Yes, sir.

          THE COURT:  Mr. Gernert.

          MR. GERNERT:  Thank you.

EXAMINATION BY MR. GERNERT:

     Q    How are you doing?

A    Fine.

     Q    You have two children?

A    Yes.

     Q    Can I ask what they do for a living?

A    One is still going to school and the other one is a

mechanic.

     Q    All right.  And the one that is going to school, is

going where?

A    Is going to Long Island University.

     Q    And studying a major?

A    When-- he finish up four years in Pennsylvania and he's

finish up two years in University out here and he is a

pharmacist, going to be a pharmacist.

     Q    His honor has just asked you really what pretty much

this is all about.  I just have a couple of prefatory

questions, if you don't mind.  Do you follow a recognized religion of some nature and if so, which one?

A    Catholic, that's all.

Q    And can I ask you what kind of last name you have?

A    Vladyka is Russian.

Q    And I didn't want to misinterpret that?

A    No problem.

Q    His honor has really asked you in his last question what this is all about.  Evidently you have some problems with the death penalty in general, just the thought of it?

A    You have to understand.  I've never been on a jury, you know, as far as I see right now as far as-- no, I don't like it but if it was imposed or had to be or if the case was there and everything was, you know--

Q    Okay.  You hold a position of management of with Ashland; is that correct?

A    That's correct.

Q    So you have to deal with differences of opinion between men, I guess, as part of the job, right?

A    Exactly.

Q    The issue really is regardless of how you feel about the death penalty, and you seem to be adverse to it, can mechanically follow instructions with some thought if the Judge says "You've got to make a certain decision regardless of how reluctant you may feel to do so," can you follow the law as the

Judge gives it to you?

A    Yeah, sure.

Q    Now, aggravating factors, as his honor has said to you, are factors the State wishes to prove after guilt is established.  First you decide whether John did what he's charged with, you understand that?

A    Uh-huh.

Q    If you decide he did, then you realize that you've already decided he did a murder?

A    Uh-huh.

THE COURT:  You have to speak up so the young lady can take down your responses.

Q    She has to take down words.

Now, once that is established, it is the State's obligation to try to do it.  That's their duty.  If it is established, we go into what is known as the penalty phase, we make the weighing of the aggravating factors, factors entered by the State legally through the Court, if it gets that far, to persuade you that John should die.  The defense seeks to put in proof of mitigating factors to persuade you that 30 years in prison without parole is enough.  Do you understand that?  -

A    Uh-huh, yes.

Q    So, you would be asked to make a weighing process between the two types of factors.  In light of that, can I ask you whether you had any experience in business, possibly

Vladyka - Gernert                                    23

personal life, even maybe through the church dealing with people that had a drug problem?

A    No.

Q    Do you feel that people, illegal drugs, cocaine, let's say heroin, something like that?

A    Yes.

Q    Should be punished or should be treated?

A    Treated.

Q    It may be that some of the mitigating factors the Judge may let you hear and we don't know. We're a week away, maybe John's age could be that he was acting strangely about the time of the incident, not so strange as to be a defense because you've already decided he's guilty but strange enough to argue that he should go to jail for 30 years instead. You may hear some testimony that he was using illegal drugs, not to forgive him because you decided he did it but as mitigating factors to argue that he should do 30 years instead of life. Can you make that weighing process?

A    Yes, I think so, sure.

MR. GERNERT:  Thank you very much.

THE COURT:  The Prosecutor.

MS. ZDOBINSKI:  Thank you.

EXAMINATION BY MS. ZDOBINSKI:

Q    MrVladyka, you've never had jury duty before?

A    No.

Vladyka - Zdobinski 24

Q    What did you think when you came here last week and the Judge told you what kind of case this was?

A    What can you do, nothing?  You have to do what you have to do.

Q    Were you surprised to hear what kind of a case it was?

A    Yes.

Q    And your thoughts up until then were that you individually were opposed to the death penalty; is that correct?

A    Yes.

Q    Knowing that that's your feeling, do you really think you'd be able to sit and listen to the evidence if we get to the penalty phase, listen to the evidence and give the State a fair shot?  In other words, would you be able to consider imposing the death penalty?

A    I guess so.

Q    So your feelings aren't that strong that it would prevent you from--

A    No, not really, either way.

Q    Because it's not going to be a hypothetical situation anymore.  You're going to be dealing with the life of a real human being.  Can you make that weighing process and would you be able to say in open Court John Martini should get the death penalty?

THE COURT:  If the facts warranted.

Vladyka - Zdobinski                                    25

Q    If the facts warranted?

THE COURT:  And that's what the jury found?

A    I don't know.

Q    I know it is a hard question.

A    It's a hard question.

Q    So you really can't say?

A    Not really.

MS. ZDOBINSKI:  Okay.  Thank you.

THE COURT:  Any other questions.

MR. GERNERT:  Yes, Judge.

EXAMINATION BY MR. GERNERT:

Q    I don't want anybody putting words in your mouth if you don't mean that.  You've thought about it, you've been on the hot spot for five to ten minutes answering questions.  The bottom line gets back to what I asked you originally.  It is a clinical decision as hard as it may be to follow instructions.

MS. ZDOBINSKI:  I'm sorry.  He said it was technical. He said clinical.  Now, I object to using those terms.

THE COURT:  I don't think anyone can really separate how they feel.  It's not--

MR. GERNERT:  I understand.

I'll phrase the question.

THE COURT:  Technical might be a better phrase.

Q    In light of the Prosecutor's objection, forget technical, forget clinical.  The real question that we have to

Vladyka - Gernert                                    26

know is:  Can you do both, having made the weighing process of aggravating and mitigating factors, are you capable in the proper circumstances to send John to death row?

A    I guess if everything was in place and I believed in it, I mean, you know it is hard to say yes or no.

Q    Well, that's why the Judge asked you the question he did and let me rephrase it, because there's been some questions that have gone in between.  It is a weighing process between aggravating and mitigating factors on the penalty phase as whether John should die which you should hear, and you're only going the hear them if certain legal requirements are met, and the judge let's you hear it.  That's what his job is.

Let's assume that there is no proof to some extent of mitigating circumstances, but there is proof only of aggravating circumstances.  It's a drastic example, but it is a possibility.  Knowing that only aggravating circumstances are in and let's say the law is and the Judge tells you that if there is no proof of mitigating circumstances, you really have no decision as a juror and he should die, could you do that?

A    I guess so.

Q    Okay.  Now when you say "I guess so," and that's a problem.  Does that mean yes, reluctantly yes?

A    Yes.

Q    Knowing the man's life is at stake, you have got to make a decision, you could could that?

37

A    I guess so, sure.

EXAMINATION BY MS. ZDOBINSKI:

Q    Mr. Vladyka, you understand the Judge isn't going to tell you that you don't have a choice. The choice is going to be the jury's when you're in that jury room discussing what you've heard and the choice is going to be either death or life with a minimum of 30 years before parole.

Now, looking at John Martini, when you think about what life with a minimum of 30 years before parole means, do you understand that that would mean he would probably be in prison for the rest of his life?

A    Yes.

MR. GERNERT:  I'm going to object to the form of the question.  There has been no evidence--this is not the determination, looking at my client now is not the determination.

THE COURT:  I'll sustain the objection.

Q    The question I asked you earlier was, would you be able in open Court to stand up and say John Martini deserves the death penalty?

MR. GERNERT:  Judge, once again, I have to object: That's a misstatement on the law.  The jury--

MS. ZDOBINSKI:  I'm sorry.  It is not a misstatement.

THE COURT:  If maybe you are the Foreperson, if he is the Foreperson, would you be able to announce that verdict in

Vladyka - Zdobinski                    28

open Court?

MR. VLADYKA:  No.

THE COURT:  Thank you, sir.  I'm going to excuse you. We'll notify the Jury Commission that you've been excused.

MR. VLADYKA:  Thank you.

THE COURT:  Thank you for the time you've spent with us.

( The witness leaves the witness stand.)

MR. GERNERT:  I object to the releasing of Mr. Vladyka, Judge.  I think he was railroaded.  The question which I objected to was the question just before he was pressed into saying could he announce in open court, he's not going to be here alone.  There's going to be 12 jurors deciding this case. He might be minority, he might be the one that doesn't have to announce that the man would have to die.  He wasn't asked that and given a chance.  I think he was unfairly treated and I think was rushed.

THE COURT:  Mr. Gernert, I don't think it should have gone on after the first time the Prosecutor questioned him when he said "I don't know."  I'm satisfied from all of his answers that he would not be able to fulfill his duty and function as a juror, and that's why I've excused him.  Your objection is noted for the record.

MR. GERNERT:  Thank you.

THE COURT:  Gladys Laden.

39

A True Copy:
Teste:

*Clerk of the United States Court of Appeals
for the Third Circuit*