**Andre STEVENS, Petitioner,**

v.

**Martin HORN, Commissioner, Pennsylvania Department of Corrections, et al., Respondents.**

No. 99–CV–1918.

United States District Court,
W.D. Pennsylvania.

May 26, 2004.

Billy H. Nolas, Esquire, Kathy Swedlow, Esquire, Defender Association of Philadel-phia, Capital Habeas Unit, Philadelphia, Counsel for Petitioner.

Christy H. Fawcett, Esquire, Office of the Attorney General, Harrisburg, Counsel for Respondents.

Christopher D. Carusone, Esquire, Office of the Attorney General, Appeals and Legal Services Section, Harrisburg, Counsel for Respondents.

## OPINION

SCHWAB, District Judge.

On April 19 through April 21, 1993, the Honorable Judge Robert E. Kunselman of the Court of Common Pleas of Beaver County presided over the non-jury guilt phase of Petitioner Andre Stevens' trial on two counts of first-degree murder in the homicides of his estranged wife, Brenda Jo Stevens, and her acquaintance, Michael Love. At the conclusion of that proceeding, the trial court convicted Stevens guilty on each count of first-degree murder. A jury empaneled for a separate penalty hearing conducted on April 27 through April 30, 1993, sentenced Stevens to death.

At issue today is Stevens' Petition for Writ of Habeas Corpus, filed pursuant to 28 U.S.C. § 2254. (*See* dkt. 7). He argues that the proceedings against him were infected with federal constitutional error and that he is entitled to a new trial or, at a minimum, a new sentencing hearing. In support, he presents fourteen claims and numerous sub-claims for relief. First, I will address his claim alleging constitutional error during the jury selection process. He contends that he is entitled to a new sentencing hearing because the trial court improperly excluded a prospective juror for cause based upon her general objection to the death penalty. This claim is meritorious; therefore, he is entitled to a new sentencing hearing. Next, I will address Stevens' only claim

alleging error regarding the guilt phase of his trial: that he received ineffective assistance of counsel because his trial attorney did not develop and present a diminished capacity defense to the charges of first-degree murder. I have determined that this claim does not warrant habeas relief.

My disposition of the above-cited claims and the conclusion that a writ of habeas corpus is issued with respect to the death sentences renders it unnecessary to address the remaining sentencing-phase claims; any relief Stevens could obtain on those claims would be cumulative.

### FACTS AND PROCEDURAL HISTORY

The trial court summarized the evidence presented at Stevens' trial as follows:

> On February 8, 1992, [Stevens] was a customer at Armando's bar, a local drinking establishment. He was seated at the end of the bar closest to the entrance. Sometime before 1:00 a.m., his estranged wife, Brenda Jo Stevens, entered the establishment with friends. She proceeded past [Stevens] and sat near the end of the dance floor with Michael Love, an acquaintance whom she had met a few months before, and they began dancing.

> [Stevens] saw them dancing together, left the bar, went to his car which was parked across the street, and secured a nine millimeter semi-automatic pistol loaded with hollow point bullets. He returned to the bar and walked across the dance floor area to the rear of the bar, cocking the gun as he proceeded. As the two victims were leaving the dance floor in different directions, [Stevens] opened fire on them. He fatally shot his estranged wife twice in the head. He turned on Michael Love and began firing a series of shots into Love's body. After a brief pause, he fired a final shot into Love's scrotum area. [Stevens] then calmly left the bar.

> While [Stevens] was shooting the two victims, the bar was occupied by many patrons and employees, some of whom where in close proximity. They were all forced to scatter or find hiding places, including a bartender who was trapped behind the bar during the siege. At least one bullet was retrieved from a bar stool which was occupied by a patron. This particular witness later noticed a bullet hole in her jacket, which had been hung on the bar stool.

> Although Brenda Jo Stevens died quickly, Michael Love remained in a state of consciousness while a friend futilely attempted to administer first aid. Love died as a result of the multiple wounds. The location and number of his wounds would have caused a great deal of pain. Several of his wounds were defensive in nature, inflicted when he raised his arms to deflect the attack.

(Dkt. 15, App. 11 at 1–2).

In February 1992, Stevens retained Wendell Freeland, Esquire, to represent him in his defense of first-degree murder charges. (See dkt. 16, App. 21 at 4). After representing the indigent Stevens for approximately nine months, in November 1992 Attorney Freeland withdrew as counsel for lack of funds. (Id.; see also id., App. 23 at 104–05). The trial court then appointed the Beaver County Public Defender's office to represent Stevens. Initially, Public Defender Knafelc handled the case, but by March 1993 Public Defender Wayne S. Lipecky, Esquire, assisted by Thomas C. Phillis, Esquire, assumed representation. (Id., App. 23 at 104–05).

The non-jury guilt phase of Stevens' trial commenced on April 19, 1993. The court convicted him on each charge of first-degree murder. (Dkt. 13, App. 2 at 595–59). The day after the guilty verdicts,

Stevens' trial proceeded to the penalty stage. Over the course of the next several days, the parties selected the jury. (*See* dkt. 14, Apps. 3–4, 6). The penalty phase of the trial commenced on April 27, 1993. (Dkt. 15, App. 7). On April 29, 1993, the jury sentenced Stevens to death on each conviction of first-degree murder. (*See* dkt. no. 31, App. 6 at 91–93).

Stevens, still represented by Attorney Lipecky, filed a timely appeal to the Supreme Court of Pennsylvania. On January 18, 1996, the court, in a unanimous decision, affirmed Stevens' judgment of sentences. *Commonwealth v. Stevens,* 543 Pa. 204, 670 A.2d 623 (1996) (*"Stevens I "*). The Governor of Pennsylvania signed Stevens' death warrant on May 8, 1995, scheduling his execution for the week of June 2, 1995. The Supreme Court of Pennsylvania, upon Stevens' motion, stayed the execution on May 23, 1995, to enable him to file a petition for writ of certiorari to the Supreme Court of the United States. The Court denied the petition on October 7, 1996. *Stevens v. Pennsylvania,* 519 U.S. 855, 117 S.Ct. 151, 136 L.Ed.2d 96 (1996). Accordingly, his conviction and sentence became final on that date. *See e.g., Swartz v. Meyers,* 204 F.3d 417, 419 (3d Cir.2000).

Upon the conclusion of his direct appeal, Stevens filed a *pro se* petition with the Court of Common Pleas of Beaver County seeking collateral relief under the Pennsylvania Post–Conviction Relief Act ("PCRA"). Ultimately, the PCRA court (which was presided over by Judge Kunselman) appointed Stevens' present counsel-attorneys from the Defender Association of Philadelphia-to represent him. On or around March 1997, they filed a counseled petition for PCRA relief. (*See* dkt.

15, App. 16). The PCRA court conducted hearings on January 26 through January 29, 1998. (*See* dkt. 16, Apps. 17–24).

Following the hearing, the PCRA court issued a decision denying Stevens relief on all claims. (Dkt. 17, Apps. 25–26). Stevens appealed to the Supreme Court of Pennsylvania. In a five to two decision, the court affirmed the denial of PCRA relief. *Commonwealth v. Stevens,* 559 Pa. 171, 739 A.2d 507 (1999) (*"Stevens II "*).

After the Supreme Court of Pennsylvania denied PCRA relief, Stevens filed the instant Petition for Writ of Habeas Corpus with this Court.[1]

### *STANDARD OF REVIEW*

Stevens filed his petition for habeas corpus relief after April 24, 1996, the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104–132 § 104, 110 Stat. 1214, so that statute applies to his case. *See Lindh v. Murphy,* 521 U.S. 320, 326–27, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). AEDPA restricts a federal court's authority to grant relief when a state court has previously considered and rejected the petitioner's federal constitutional claims on the merits. 28 U.S.C. § 2254(d). It provides, in relevant part:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

---

1. Stevens' petition was originally assigned to the Honorable Donald J. Lee. It was assigned to me upon Judge Lee's retirement. Before ruling on the petition, I directed that the Respondents supplement incomplete portions of the state court record and also directed that the parties file supplemental legal briefs.

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding.

28 U.S.C. § 2254(d).

The Supreme Court interpreted the standard set forth in § 2254(d)(1) for the first time in *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). First, it instructed that the federal court must decide exactly what is the applicable clearly established law determined by the Supreme Court. *Williams,* 529 U.S. at 390, 120 S.Ct. 1495; *see also Hameen v. State of Delaware,* 212 F.3d 226, 235 (3d Cir.2000). Next, the court must determine whether the state court's decision was "contrary to" or "an unreasonable application of" that law.[2] 28 U.S.C. § 2254(d)(1).

The Supreme Court also explained that the two clauses of § 2254(d)(1) have independent meaning: "[A] decision by a state court is 'contrary to' our clearly established law if it applies a rule that contradicts the governing law set forth in our cases or if it confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." *Id.* at 405–06, 120 S.Ct. 1495. "[A] run-of-the-mill state-court decision applying the correct legal rule from [Supreme Court] cases to the facts of a prisoner's case [does] not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." *Id.* at 406, 120 S.Ct. 1495.

The Supreme Court further stated that the "unreasonable application" clause of § 2254(d)(1) permits a federal habeas court to "grant the writ if the state court

identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts" of the petitioner's case. *Id.* at 413, 120 S.Ct. 1495. More recently, the Supreme Court has explained that when analyzing a state court decision under § 2254(d)(1)'s "unreasonable application" clause:

> [A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied a Supreme Court case incorrectly. Rather, it is the habeas applicant's burden to show that the state applied that case to the facts of his case in an objectively unreasonable manner.

*Price v. Vincent,* 538 U.S. 634, 641, 123 S.Ct. 1848, 155 L.Ed.2d 877 (2003) (quoting *Bell v. Cone,* 535 U.S. 685, 699, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002); citing *Williams,* 529 U.S. at 411, 120 S.Ct. 1495; *Woodford v. Visciotti,* 537 U.S. 19, 24–25, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002)) (internal quotations, citations, and brackets omitted).

Although the Supreme Court has yet to address the precise scope of § 2254(d)(2), the Court of Appeal for the Third Circuit has interpreted that section to require a review of the record to determine whether the state court's findings were unreasonable in light of the state court record. *See e.g., Williams v. Price,* 343 F.3d 223, 234 (3d Cir.2003)

Importantly, § 2254(d)(1) and (2) do not apply to all cases that otherwise fall within AEDPA's reach. The introductory sentence of § 2254(d) explicitly limits its application to only those claims that were "adjudicated on the merits in State court proceedings." 28 U.S.C. § 2254(d). "An

---

**2.** The Third Circuit has held that a federal court's analysis of whether a state court's decision is "contrary to" or an "unreasonable" application of Supreme Court precedent under § 2254(d) may be amplified by deci-

sions of inferior federal courts evaluating that Supreme Court precedent. *Hardcastle v. Horn,* 368 F.3d 246, 256 n. 3 (3d Cir.2004) (citing *Matteo v. Superintendent, SCI Albion,* 171 F.3d 877, 890 (3d Cir.1999) (*en banc*)).

'adjudication on the merits' has a well settled meaning: a decision finally resolving the parties' claims, with *res judicata* effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground." *Rompilla v. Horn,* 355 F.3d 233, 243 (3d Cir.2004), *rehearing denied,* 359 F.3d 310 (3d Cir.2004) (internal quotations and citations omitted). "[A] state court may render an adjudication or decision on the merits of a federal claim by rejecting the claim without any discussion whatsoever." *Id.* at 247 (citing *Weeks v. Angelone,* 528 U.S. 225, 237, 120 S.Ct. 727, 145 L.Ed.2d 727 (2000); *Chadwick v. Janecka,* 312 F.3d 597, 605–07 (3d Cir.2002), *cert. denied,* 538 U.S. 1000, 123 S.Ct. 1914, 155 L.Ed.2d 828 (2003)). However, if the state court has not reached the merits of a claim thereafter presented to a federal habeas court, the standard of review set forth in § 2254(d) does not apply. *Id.* at 248; *see also Appel v. Horn,* 250 F.3d 203, 210 (3d Cir.2001). In such cases, the court should exercise "pre-AEDPA independent judgment." *Hameen,* 212 F.3d at 248; *see also Appel,* 250 F.3d at 210. "But if the state court decided the claim, the § 2254(d)[ ] standards govern-regardless of the length, comprehensiveness, or quality of the state court's discussion." *Rompilla,* 355 F.3d at 248 (citations omitted).

Finally, under § 2254(e)(1) the state courts' factual findings are presumed correct, and the petitioner has the burden of rebutting this presumption by clear and convincing evidence. *Rompilla,* 355 F.3d at 252–53 (citing 28 U.S.C. § 2254(e)(1)); *Appel,* 250 F.3d at 210 (same).

### *JURY SELECTION*

**I. Was the Jury Before Which Stevens Was Sentenced Improperly Death Qualified, Entitling Him to a New Penalty Hearing?**

Stevens contends that he is entitled to a new sentencing hearing because he was denied an impartial capital-sentencing jury, in violation of his Sixth and Fourteenth Amendment rights. He claims that the trial court's exclusion for cause of a veniremember who had merely expressed her personal opposition to the death penalty violated *Witherspoon v. Illinois,* 391 U.S. 510, 522, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). In that case, the Supreme Court held that a sentence of death cannot be carried out if the jury that imposed it was chosen by excluding potential jurors for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction. *Id.*

### A. Factual Background

Stevens bases his claim upon the following exchange between the trial court and the veniremember during *voir dire,* which he claims was insufficient to justify her excusal for cause:

> The Court: As you know you are being considered as a juror in a case involve [sic] the deaths by homicide of Brenda Jo Stevens and Michael Love.... The Defendant is Andre Stevens and the Commonwealth has secured a verdict of guilty of murder of the first degree with respect to both of those deaths. It is now up to a jury to determine whether to impose the penalty of death or the penalty of life imprisonment upon Mr. Stevens. Do you have an opinion about the death penalty which would prevent you from following the Court's instructions as to what penalty should be imposed?

> A. I don't believe in the death penalty.

> The Court: Very well.

> Mrs. Dukovich [prosecutor]: Challenge for cause, Your Honor.

The Court: Very well. You are excused, thank you.

(Dkt. 14, App. 3 at 160–61).

## B. Standard of Review

Stevens raised this same claim during the PCRA proceedings. The Supreme Court of Pennsylvania denied it on the merits, deferring to the trial court's assessment of the veniremember's alleged bias.[3] *Stevens II*, 739 A.2d at 521. Because the state court adjudicated this claim on the merits and because the determination challenged in this claim is a factual one, § 2254(d)(2)'s standard of review applies. *Martini v. Hendricks*, 348 F.3d 360, 363 (3d Cir.2003). Accordingly, this Court must decide whether the state court's adjudication "resulted in a decision that was based on an unreasonable determination of the facts[.]" 28 U.S.C. § 2254(d)(2). Also relevant to this analysis is § 2254(e)(1)'s presumption that a state court's factual determination of bias is presumed to be correct, rebuttable only upon a showing of clear and convincing evidence.[4] *Id.*

## C. Legal Analysis

In *Witherspoon*, a direct appeal from a criminal conviction, the Supreme Court concluded that if a trial court excuses potential jurors for cause simply because they "expressed qualms about capital punishment," 391 U.S. at 513, 88 S.Ct. 1770, the jury obtained would not be the impartial jury required by the Sixth Amendment, but rather one "uncommonly willing to condemn a man to die." *Id.* at 521, 88 S.Ct. 1770. It held: "a sentence of death cannot be carried out if the jury that imposed it or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty[.]" *Id.* at 522, 88 S.Ct. 1770.

Recognizing, however, that jurors so opposed to capital punishment that they would not follow their oaths and the trial court's instructions might frustrate the state's legitimate interest in administering constitutional capital-sentencing schemes, the Court acknowledged that a trial court may properly exclude a potential juror for cause if the prosecution satisfies its burden of showing through *voir dire* that the individual would not apply the law to the facts

---

**3.** In ruling on this claim, the *Stevens II* court stated that "it accept[ed] the statement of the trial court in its [PCRA] opinion when it stated that its decision not to conduct further inquiry with respect to this juror was based on its assessment of her demeanor in responding to the question." 739 A.2d at 521. In ruling on this claim, the PCRA court (Judge Kunselman) noted that, while it had "no specific recollection" of the veniremember at issue, her demeanor must have "clearly conveyed her unwillingness to comply with the court's instruction," or it would not have dismissed her for cause. (Dkt. 17, App. 26 at 52).

**4.** As an analytical matter, the relationship between § 2254(d)(2) and § 2254(e)(1) is not entirely clear, and the question of how to harmonize these two provisions has troubled some courts and commentators alike in the years since AEDPA's passage. *See e.g.,* Randy

Hertz & James S. Liebman, I *Federal Habeas Corpus Practice and Procedure* § 20.2c (4th ed. 2001 & Supp.2003); Larry W. Yackle, *Federal Evidentiary Hearings Under the New Habeas Corpus Statute*, 6 B.U. Pub. Int. L.J. 135, 140–41 (1996); *see also Breighner v. Chesney*, 301 F.Supp.2d 354 (M.D.Pa.2004). The Third Circuit has not expressly examined the relationship of the two provisions *inter se*, but has applied them together when reviewing a state court's adjudication of a *Witherspoon* claim. *Martini*, 348 F.3d at 363. Accordingly, this Court shall do the same. Moreover, I need not determine the exact contours of the relationship between § 2254(d)(2) and (e)(1) because the state court's factual determination has been shown to be incorrect by "clear and convincing evidence" and reflects an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

because of bias against capital punishment (properly death qualifies the jury). *Wainwright v. Witt*, 469 U.S. 412, 423, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) (citing *Reynolds v. United States*, 98 U.S. 145, 157, 25 L.Ed. 244 (1878)). Importantly, however, the Court in *Witherspoon* held that the state's power to exclude did not extend beyond its interest in removing those individuals who would not set aside their beliefs and apply the law to the facts because of a bias against capital punishment. With this acknowledgment in mind, the Court in *Wainwright v. Witt,* a case decided in the context of federal habeas corpus review, clarified the limitation standard set forth in *Witherspoon.* In that decision, the Court explained that a trial court may properly excuse a juror for cause if that individual's opposition to capital punishment "would prevent or substantially impair the performance of his duties as a juror in accordance with this instructions and his oath." *Witt,* 469 U.S. at 412, 105 S.Ct. 844.

■ The Third Circuit applied the *Witherspoon/Witt* standard in *Szuchon v. Lehman,* 273 F.3d 299 (3d Cir.2001). In that case, the prosecutor had asked a potential juror named Rexford during *voir dire* whether, if the evidence supported a first-degree murder conviction, he would "have any conscientious scruple or hesitation to find [Szuchon] guilty of first degree murder?" *Szuchon,* 273 F.3d at 329–30. Rexford answered: "I do not believe in capital punishment." *Id.* The prosecutor next asked: "You do not believe in capital punishment?," to which Rexford responded: "No." *Id.* at 330. The prosecutor immediately challenged Rexford for cause, defense counsel did not object, and the challenge was granted. *Id.* On these facts, the Third Circuit found a *Witherspoon* error. *Id.* It stated:

Rexford's mere lack of belief in capital punishment was a "broader basis" for exclusion than inability to follow the law. Indeed "those who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law." *Lockhart v. McCree,* 476 U.S. 162, 176[, 106 S.Ct. 1758, 90 L.Ed.2d 137] (1986). Neither the Commonwealth nor the trial court, however, questioned Rexford about his ability to set aside his beliefs or otherwise perform his duty as a juror. As a result, there was no evidence or even a suggestion that Rexford would act in a biased fashion due to his lack of belief in capital punishment, and the trial court, therefore, failed in its duty to determined that there was a proper basis for the exclusion.... Thus, while we begin with the presumption that the trial court's determination of bias is correct, that presumption cannot adhere in the absence of record support for the exclusions.

. . . .

...The prosecutor failed ... to meet his burden under *Witt* of asking even a limited number of follow-up questions to show that Rexford's views would render him biased.

Thus, the only supportable inference on this record is that Rexford was excluded because he voiced general opposition to the death penalty. Rexford also did not "express unwillingness" to impose the death penalty. He merely stated that he did not "believe" in capital punishment, which is by no means the equivalent of being unwilling to impose it. Again, even those firmly opposed to the death penalty can serve as jurors if they are "willing to temporarily set aside their own beliefs in deference to the rule

of law." *Lockhart,* 476 U.S. at 176, 106 S.Ct. 1758[.]

*Id.* After determining that Rexford's exclusion violated Szuchon's rights under *Witherspoon,* the Third Circuit granted him habeas relief, entitling him to a new sentencing hearing.

The Respondents, while admitting that "[o]n first glance it might appear that [*Szuchon*] mandates relief[,]" argues that it is distinguishable on two bases. (*See* dkt. 26 at 14–17). First, Respondents correctly note that AEDPA's amendments to the federal habeas statute did not apply in *Szuchon* because the petitioner had filed his initial habeas petition prior to its enactment. *See Szuchon,* 273 F.3d at 312. They then argue that Stevens has not overcome AEDPA's "different and greater standard of deference[.]" (Dkt. 26 at 14).

Their argument is unpersuasive. Even prior to AEDPA's enactment, federal habeas corpus law provided a large measure of deference to the type of state court factual determinations that are at issue in this claim. In *Witt,* decided in 1985, the Supreme Court emphasized that considerable deference was to be given to the trial court's first-hand evaluation of the potential juror's demeanor. 469 U.S. at 426–35, 105 S.Ct. 844. Pre–AEDPA, a state court's factual findings were presumed correct unless they were not "fairly supported by the record." *Id.; Szuchon,* 273 F.3d at 312. In practice that is the same standard that federal courts apply to a decision adjudicated on the merits in a state court and based on a factual determination, which now is reviewable under 28 U.S.C. § 2254(d)(2). *See e.g., Lam v. Kelchner,* 304 F.3d 256, 266 (3 Cir.2002) (applying AEDPA: "[W]e must ascertain whether the record supports the court's factual findings.... If the record supports the [state] court's findings, we may only reverse if the court drew an erroneous

legal conclusion from the facts."); *see also Gall v. Parker,* 231 F.3d 265, 331 (6th Cir.2000) (cited with approval in *Szuchon,* 273 F.3d at 328) (applying AEDPA and reviewing merits of *Witherspoon* claim by determining whether the factual record "fairly support[s]" the trial court's determination of bias).

Section 2254(e)(1) does add another layer of review to factual determinations-requiring that they be presumed correct absent "clear and convincing evidence" to the contrary-but that standard is not insurmountable. As the Supreme Court recently stated:

> Even in the context of federal habeas, deference does not imply the abandonment or abdication of judicial review. Deference does not be definition preclude relief. A federal court can disagree with a state court's credibility determination and, when guided by AEDPA, conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence.

*Miller–El v. Cockrell,* 537 U.S. 322, 340, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003).

Moreover, federal courts conducting review under § 2254(e)(1) still examine the state record to find support for the state court's factual determinations. In the recent decision of *Martini v. Hendricks,* 348 F.3d 360 (3d Cir.2003), the Third Circuit applied § 2254(e)(1)'s presumption of correctness to the petitioner's *Witherspoon* challenge to the trial court's finding of bias. The *Martini* court instructed that to determine whether a petitioner has overcome § 2254(e)(1)'s presumption of correctness "it is crucial to examine the transcript in detail." *Id.* at 364. It ultimately concluded that the *voir dire* transcript did not reveal clear and convincing evidence that the trial court's factual finding was incorrect, but it reached that conclusion

only after reviewing the lengthy questioning of the potential juror, Valdyka, who vacillated repeatedly about whether he could vote to impose the death penalty. *Id.* at 364–68. Yet, even with the thorough questioning and all of Valdyka's equivocal responses, the *Martini* court still considered the petitioner's claim that he had overcome § 2254(e)(1)'s presumption of correctness to be a "close and difficult" one. *Id.* at 362. *Martini* also highlights that, while a judge may rely on an assessment of the potential juror's demeanor to determine bias, even under AEDPA's standards of review there must be some actual support reflected in the record to support the conclusion that the potential juror would not be able to set aside his or her bias against the death penalty and apply the law as instructed by the trial court. *Id.; see also Gall,* 231 F.3d at 331. In this case, there is no such support.

The Respondents next argue that *Szuchon* is distinguishable because in that case Rexford was not asked, as the veniremember was here, whether he could follow the court's instructions. This argument also is unconvincing. While the question posed by the trial court in *Szuchon* was phrased differently than that at issue here, the trial court in that case did ask Rexford whether, if the facts and the law warranted, he could convict the defendant of first-degree murder. In effect, the trial court asked Rexford whether he had any beliefs that would interfere with him imposing one of the possible penalties for first-degree murder: a sentence of death. That is exactly how Rexford interpreted the question, because he answered: "I do not believe in capital punishment." *Szuchon,* 273 F.3d at 329–30.

As with Rexford in *Szuchon,* the veniremember in this case expressed only her general opposition to capital punishment. (*See* dkt. 14, App. 3 at 161). She indicated that general opposition in response to the trial court's compound question:

Q. Do you [1] have an opinion about the death penalty [2] which would prevent you from following the Court's instructions as to what penalty should be imposed?

(*Id.*) She, like Rexford in *Szuchon,* "interpreted the question as seeking [her] views on capital punishment." *Szuchon,* 273 F.3d at 330. And, as a result, she answered only the first part of the question, stating: "I do not believe in the death penalty." (Dkt. 14, App. 3 at 161).

Here, as in *Szuchon,* after the veniremember expressed her general opposition against the death penalty, the prosecutor did not ask any additional questions to probe whether the veniremember could set aside her opposition to capital punishment and apply the law. And, she never stated, or equivocated about whether, she could set aside her beliefs and apply the court's instructions. *Compare Witt,* 469 U.S. at 434, 105 S.Ct. 844 (where the Court determined that the juror was properly struck because she repeatedly "affirmed that her beliefs would interfere with her sitting as a juror[.]"); *with Szuchon,* 273 F.3d at 330 (*Lockhart,* 476 U.S. at 176, 106 S.Ct. 1758); *Gall,* 231 F.3d at 330–331. Instead, the trial court granted the prosecution's immediate request that she be excused for cause. As a result, the "prosecutor failed ... to meet [her] burden ... of asking even a limited number of follow-up questions" to demonstrate bias. *Szuchon,* 273 F.3d at 331.

Respondents have not directed this Court to any authority in which the prosecution met its burden of exclusion under *Witherspoon/Witt* with so little questioning. In *Gall v. Parker,* 231 F.3d 265 (6th Cir.2000) (post-AEDPA case; cited with approval in *Szuchon*), the Sixth Circuit granted the petitioner habeas relief on his

*Witherspoon* claim, and the questions posed to the potential juror, Correll, in that case were considerably more probative of bias than the one question at issue here. In that case, "the prosecuting attorney had failed to elicit a definite answer as to whether Correll's conscience would permit him to 'consider the death penalty as is required by law.'" *Gall v. Commonwealth*, 607 S.W.2d 97, 103 (Ky.1980). Then, the trial court asked him, and he answered, as follows:

Q. Would your feelings absolutely preclude you from imposing a sentence of death under any circumstances, any circumstances that you could think of?

A. I just don't know, sir, whether it would or would not, really.

Next, the defense counsel asked:

Q. Mr. Correll, the court, in essence, is asking you if there is any case where you would consider imposing the death penalty. For instance, if Hitler were on trial here today for killing all the Jews, you could consider imposing the death penalty in that case couldn't you?

A. I would be undecided, sir. At this point.

*Id.* In granting the petitioner federal habeas relief on his subsequent *Witherspoon* claim, the Sixth Circuit court noted that Correll stated that his mind was not "closed" to imposing the death penalty, "just undecided." *Gall*, 231 F.3d at 331. He also stated that he would "very possibl[y]" feel the death penalty was appropriate in certain factual scenarios. *Id.* Based upon that testimony, the *Gall* court determined that Correll:

was not "so irrevocably opposed to capital punishment as to frustrate the State's legitimate efforts to administer its" death penalty scheme[.] ... [U]nlike the juror who was properly struck in *Witt* because she repeatedly "affirmed that her beliefs would interfere with his sitting as a juror," ... Correll not once stated that his beliefs would deter him from serving as an impartial juror. Correll's exclusion was thus error.

*Id.*

Finally, the lack of any additional questioning of the veniremember in this case makes it distinguishable from *Martini*. There, the potential juror, Vladyka, stated during *voir dire* that he did not believe in the death penalty. *Id.* at 364. He then answered "No" in response to the question of whether he thought "there are any crimes where the death penalty is an appropriate penalty?" *Id.* The *Martini* court noted that Vladyka's "mere personal opposition to the death penalty," as reflect in that point of the *voir dire* transcript, was insufficient to warrant his excusal for cause. It then proceeded to review the lengthy follow-up questions posed by the trial court, the prosecutor, and the defense counsel as to whether Vladyka could separate his personal beliefs in opposition to the death penalty from the task at hand. *Id.* at 364–66.

In response to the trial court's question of whether he could impose the death penalty if the facts of the case and the law required that it be imposed, Vladyka responded: "Yes, sir." *Id.* at 364. Later, however, he qualified this assurance. The prosecutor asked him if he "would ... be able to consider imposing the death penalty?," to which he answered: "I guess so." *Id.* at 365. Retreating even further from that stance, in response to the prosecutor's question: "Can you make the weighing process and would you be able to say in open Court John Martini should get the death penalty?," Vladyka answered: "I don't know ... It's a hard question." *Id.* Similarly, when questioned by the public

defender: "are you capable in the proper circumstance to send John [Martini] to death row?" he replied, "I guess if everything was in place and I believed in it, I mean, you know it is hard to say yes or no." *Id.*

The trial court, faced with Vladyka's equivocal responses, excused him for cause. *Id.* at 366–67. As noted above, after reviewing the *voir dire* transcript and finding support in the record for the trial court's factual determination of bias, the *Martini* court denied habeas relief on the *Witherspoon* claim. *Id.* at 367–68. But in contrast to that case, in the instant case there was no equivocation; no "I think so," "I don't know," or "I guess so." Here, the veniremember made only one statement: "I don't believe in the death penalty." Even through the lens of AEDPA's standards of review, the trial court's assessment of bias on that statement alone amounts to constitutional error.

Accordingly, I am constrained to conclude that the state court's finding of bias upon the part of the veniremember at issue was unreasonable within the meaning of § 2254(d)(2), and, that on the existing record Stevens has rebutted the "presumption of correctness" accorded to that finding under § 2254(e)(1). Because a violation of *Witherspoon* is reversible error not subject to harmless error analysis, *see e.g., Gray v. Mississippi,* 481 U.S. 648, 668, 107 S.Ct. 2045, 95 L.Ed.2d 622 (1987);

*Davis v. Georgia,* 429 U.S. 122, 123, 97 S.Ct. 399, 50 L.Ed.2d 339 (1976) (the improper exclusion of one veniremember out of eighty-three was reversible error), Stevens is entitled to a new sentencing hearing.[5] *See Szuchon,* 273 F.3d at 331.

## GUILT PHASE

### II. Did Stevens Receive Ineffective Assistance of Counsel at the Guilt Phase of His Trial?

 Stevens raises a single claim for relief from his convictions of first-degree murder: that he received ineffective assistance of counsel in violation of his Sixth and Fourteenth Amendment rights because Attorney Lipecky allegedly failed to investigate, develop and present a diminished capacity defense to the charges of first-degree murder.[6]

In support of this claim, Stevens contends that Attorney Lipecky did not expand upon Attorney Freeland's preliminary investigations and also failed to effectively use the contents of Attorney Freeland's files. Specifically, Stevens identifies the following four types of information that he claims his counsel possessed and failed to expand upon and effectively use, or failed to investigate and present: (1) a twenty-two page "journal" kept by Stevens prior to the murders, which he claims demonstrated that he was mentally ill at the

---

5. Stevens also raises a claim that Attorney Lipecky was ineffective in failing to object to the veniremember's exclusion and for not raises his ineffectiveness on direct appeal. Because I find a violation of *Witherspoon per se,* I need not reach the ineffective assistance of counsel claim. *See Szuchon,* 273 F.3d at 329 n. 18.

6. Pennsylvania law recognizes the diminished capacity defense "to show that a defendant did not have the capacity to possess the state of mind required by the legislature to commit

a particular degree of the crime charged." *Zettlemoyer v. Fulcomer,* 923 F.2d 284, 295 (3d Cir.1991) (citing *Commonwealth v. Walzack,* 468 Pa. 210, 360 A.2d 914, 919–20 (1976)). It is an extremely limited defense. *Id.; see also Commonwealth v. Davis,* 331 Pa.Super. 59, 479 A.2d 1077, 1080 (1984). A defendant invoking the defense concedes general criminal liability and must prove that his mental condition at the time of the offense was such that he was incapable of forming the specific intent to kill. *Id.*

time of the crimes; (2) letters Stevens had written to Attorney Freeland that demonstrated paranoid and delusional thinking; (3) complete military, employment, and school records detailing Stevens' history of mental health problems, and (4) information from Stevens' daughter and two sisters detailing his difficult childhood, medical history, and troubled life. (Dkt. 29 at 3–4). He also contends that had his counsel properly used and developed this information, the defense would have had available to it expert mental health testimony that would have established that he was psychotic at the time of the offenses, suffers from, and suffered at that time, organic brain damage, severe depression, and disordered thinking. (Dkt. 7, ¶ 7–8).

### A. Factual Background

As set forth above, following his arrest Stevens retained Attorney Freeland to represent him. (*See* dkt. 16, App. 21 at 4). In gathering information to prepare for the defense of his client, Attorney Freeland spoke with Karen Mangieri, the daughter of the petitioner and Brenda Jo. (*See id.* at 7–8). Attorney Freeland's notes reflect that Mangieri asked him if anyone was going to evaluate her father, because she thought he was "crazy." (*Id.;* *see also* dkt. 30, App. 1, PCRA Ex. AA). In addition to his notes, Attorney Freeland's file also contained a twenty-two page journal that Stevens had maintained prior to the homicides, his partial military and employment records, and three letters that he had written to Attorney Freeland after the crimes. (*See* dkt. 30, App. 1, PCRA Exs. BB, CC, DD).

In August 1992, when Stevens was still represented by Attorney Freeland, the Commonwealth retained psychiatrist Dr. Christine Martone for the purpose of eval-

uating Stevens to determine if he was competent to stand trial. (Trial Tr. 4/28/1993 at 41). On August 24, 1992, Dr. Martone issued her report. In it, she stated:

> The defendant is competent to stand trial. He understands the charges against him and is able to cooperate in his own defense. The defendant does not suffer from a psychotic disorder and in my opinion there is no evidence that this defendant fulfills the criteria of the McNaught [sic] definition of not guilty by reason of insanity. He certainly was able to appreciate the nature and quality of his act and the wrongfulness of it. Concerning the issue of guilty but mentally ill, again, the defendant is not now and was not at the time of the incident suffering from a psychotic disorder. He was preoccupied with his wife. He was not able to accept the divorce and had certain personality disorder traits. However, he did not lack, in my opinion, the ability to appreciate the nature and quality of his act and the wrongfulness of it, nor was he unable to conform his behavior to the norms of society.

(Dkt. 32, PCRA Ex. V).

In November 1992, after representing the indigent Stevens for approximately nine months, Attorney Freeland withdrew as counsel for lack of funds. (Dkt. 16, App. 21 at 4; App. 23 at 104–05). The trial court appointed the Beaver County Public Defender's office to represent Stevens and by March 1993, Attorney Lipecky assumed representation. (*Id.,* App. 23 at 104–05). Soon thereafter, counsel filed a motion for the appointment of a psychiatrist and psychologist to assist the defense. (Dkt. 31, App. 5). On March 9, 1993, the trial court granted the defense's motion (*id.*), and Attorney Lipecky retained psychiatrist Rodney Altman, D.O., to conduct a mental-health examination of Stevens.[7] (*See* dkt. 16, App. 23 at 108–109).

---

**7.** After the conclusion of the guilt phase, At-
torney Lipecky retained a second psychiatrist,

Dr. Altman, a board-certified psychiatrist, conducted his initial examination of Stevens on March 29, 1993. (Dkt. 15, App. 9 at 12; dkt. 16, App. 24 at 4). He then contacted psychologist Ralph E. Landefeld, Ph.D., to assist him in his evaluation by performing psychological tests on Stevens. (Dkt. 16, App. 17 at 9). Dr. Landefeld performed a psychological screening of Stevens, which consisted of a clinical interview and also the administration of several psychological tests, including the Minnesota Multiphasic Personality Inventory–2, the Rorschach Test, the Benton Test of Visual Retention, and the Trail Making Test. (*Id.*, App. 17 at 10–12).

Dr. Altman and Dr. Landefeld determined that Stevens was not psychotic and was not exhibiting any schizophrenic illness. (*See e.g., id.*, App. 24 at 112). In his report, issued on or around April 9, 1993, Dr. Landefeld diagnosed Stevens as having an: "Adjustment Reaction, with depressed mood" and "Paranoid Personality Disorder, with borderline and antisocial traits." (Dkt. 30, App. 1, PCRA Ex. H). Dr. Landefeld verbally informed Dr. Altman of the results of his testing, and then Dr. Altman examined Stevens for a second time. (Dkt. 16, App. 24 at 11; *see also* dkt. 30, App. 1, PCRA Ex. O). On April 15, 1993, Dr. Altman issued his report. In it, he concluded:

> *DISCUSSION AND FORMULATION:*
> Mr. Stevens is an individual who has had a long history of emotional distrubance [sic] first recognized in his early teens while in the military and evidencing paranoid traits, schizoidal and isolative tendencies as well as possible overt psychosis. He has continued to have symptomatology within the same realm. Although a large gap from his teens until his mental health commitment in 1972 is lacking, he again in 1972 evidences paranoid and quasi delusional thinking as well as impulse discontrol.
> *CURRENT MENTAL STATUS EXAMINATION:*
> Evidences continuing paranoid ideation as a predominate feature with periods of projection and externalization onto others as plotting in some way against him. He has difficulty in focus, continues to have tangential and circumstantial thought process and resultant difficulty in modulating his impulses when faced with either real or an imagined threatening situation. Individuals such as Mr. Stevens can, at times of acute emotional turmoil, misperceive reality and can lack the ability to modulate their emotions with impulsive acting-out behavior. His current ambivalence and apathy are secondary to being within a very structured and regimented environment, namely jail, but do not alleviate the continued core problem of a relatively severe personality disorder consisting of paranoia, mood fluctuations, difficulties in judgment as well as rationalized disregard and retribution for and against others as a result of his continued paranoid personality.
> It is my opinion that given Mr. Stevens overall mental defects that when removed from a rigid and structured environment and placed under severe mental duress that he could decompensate and misperceive reality as well as act out impulsively in a manner perceived by him to protect his own well-being from the aggressions of either direct or indirect of others.

(Dkt. 30, App. 1, PCRA Ex. O).

The guilt phase of Stevens' trial commenced on April 19, 1993. Attorney Li-

---

Dr. Martone, to assist the defense in developing expert mental health mitigating evidence. She was the doctor that the Commonwealth had previously retained to conduct a competency evaluation on Stevens in August 1992.

pecky, believing that Stevens would "undoubtedly" be found guilty of first-degree murder, advised his client to waive his right to a jury during the guilt stage of his trial. (Dkt. 16, App. 23 at 95–97). According to Lipecky, this strategy was pursued in the hopes that the defense would be able to limit the evidence submitted by the Commonwealth during the penalty phase of his trial, which would be conducted before a jury, to only that which was relevant to the aggravating circumstances and thereby prevent the introduction of the more inflammatory details of the double homicide. (*Id.* at 96–98, 103). Attorney Lipecky also explained that another critical reason for proceeding with a non-jury guilt trial was that Stevens did not show remorse for his crimes. (*Id.* at 119).

Stevens testified in his own defense. (Dkt. 13, App. 2 at 490). He described his troubled marriage, explained that he and his wife were in the process of divorcing and that he became enraged when he saw her dancing with Love at Armando's bar. (*Id.* at 528–530). He further testified that he left the bar, went to his car, retrieved his pistol, cocked it three times, hid it under his clothing and then went back into the bar. (*Id.* at 530–31). He admitted that he shot and killed both his estranged wife and Love. (*Id.* at 525, 532–33).

Stevens' principal defense at the guilt phase was that he lacked the requisite *mens rea* necessary to convict him of first-degree murder. However, Dr. Altman and Dr. Landefeld had not provided the defense with any expert mental health evidence to support the defense. Nevertheless, Attorney Lipecky argued to the court during closing arguments that:

It is [Stevens'] position that [his] state of mind, which has evolved for 27 years and many, many, many stressful situations, prevented him from forming the necessary intent to kill in order for him to be convicted of first degree murder.

...

[Stevens] is a man who has been troubled virtually all his life. He had a psychiatric condition while a young man in the Navy. He had already developed a paranoia personality disorder by that time. He is not insane. The question again for the Court to decide is whether he could form the necessary intent to commit first degree murder based on his perception that he had amassed over 27 years of marriage with his wife, separation after separation, charges of infidelity, drug use, alcohol abuse, real or imagined lead him inevitably to destruction of his wife and Michael Love who is placed in this tragic situation through no fault of his own. This in no way vindicates the actions of [Stevens] on February 8, 1993[sic]. He is guilty of homicide but not of murder in the first degree.

(*Id.* at 585–86). The trial court rejected this defense, and convicted Stevens on each charge of first-degree murder. (*Id.* at 595–69).

### B. Legal Analysis

In *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court set out two components to a Sixth Amendment claim for ineffective assistance of counsel. *See also Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 2535, 156 L.Ed.2d 471 (2003); *Williams*, 529 U.S. at 390–91, 120 S.Ct. 1495. The first prong of the *Strickland* test requires a defendant to establish that his attorney's representation fell below an objective standard of reasonableness by committing errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052; *Wiggins*, 123 S.Ct. at 2535. Obviously, when a petitioner claims that his counsel

failed to raise a claim that the court determines to be meritless, habeas relief under *Strickland* is not available. *See id.* at 691, 104 S.Ct. 2052 (the failure to pursue "fruitless" claims "may not be challenged as unreasonable.") A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the petitioner must overcome the presumption that, under the totality of the circumstances, the challenged action "might be considered sound trial strategy." *Id.* at 689, 690–92, 104 S.Ct. 2052. The question is not whether the defense was free from errors of judgment, but whether counsel exercised the customary skill and knowledge that normally prevailed at the time and place. *Id.; Rompilla,* 355 F.3d at 258–59.

The second prong under *Strickland* requires a petitioner to demonstrate that counsel's errors prejudiced the defense. *Id.* at 692. To prove prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052; *Wiggins,* 123 S.Ct. at 2542.

At the time the state courts reviewed this claim, *Strickland*'s familiar two-prong test was the "clearly established federal law" applicable to ineffective assistance of counsel claims. And, the Supreme Court

of Pennsylvania had expressly stated that the standard for judging ineffective assistance of counsel claims under its law was identical to the standard enunciated by the Supreme Court of the United States in *Strickland. See e.g., Commonwealth v. Pierce,* 515 Pa. 153, 527 A.2d 973, 975–77 (1987); *see also Rompilla,* 355 F.3d at 248. Accordingly, federal courts conducting habeas review upon ineffective assistance of counsel claims *that have been adjudicated on the merits* by a Pennsylvania state court do so pursuant to AEDPA's § 2254(d)(1)'s standard of review.[8] *See e.g., Rompilla,* 355 F.3d at 248–49; *Werts v. Vaughn,* 228 F.3d 178, 202–04 (3d Cir. 2000); *Pursell v. Horn,* 187 F.Supp.2d 260, 340 (W.D.Pa.2002) (Smith, C.J.).

**1. Deficient Performance**

**a. Standard of Review**

Stevens raised this same claim during his PCRA proceedings. In its review of this particular claim, the Supreme Court of Pennsylvania stated that it need not determine whether trial counsel's conduct with regard to developing a diminished capacity defense amounted to constitutionally deficient performance because Stevens failed to show that he was prejudiced. *Stevens II,* 739 A.2d at 507. Because the Supreme Court of Pennsylvania did not adjudicate *Strickland*'s deficient performance prong on the merits, § 2254(d)(1) does not apply, and this Court must conduct a *de novo* review of this portion of the *Strickland* analysis. *Wiggins,* 123 S.Ct. at 2542.[9]

**8.** This is so even if the Pennsylvania court has not cited *Strickland* or any other federal cases, because it invariably cites to state precedent (or the progeny of state precedent), which relies on *Strickland.* Of course, the Supreme Court of the United States has made clear that citation or even awareness of its precedent is unnecessary as long as neither the reasoning nor the result of the state court decision contradicts it. *Early v. Packer,* 537

U.S. 3, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (per curiam).

**9.** As set forth above, § 2254(d) applies only to those aspects of a petitioner's claim that the state court has actually decided. In *Wiggins,* the Supreme Court reviewed the habeas petitioner's ineffective assistance claim. 123 S.Ct. at 2542. The state court had decided the deficient performance prong of the claim,

### b. Counsel did not provide constitutionally deficient performance

In order to establish that he received ineffective assistance of counsel, Stevens must show that Attorney Lipecky's representation "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052. Recognizing that the scope and intensity of defense counsel's investigation and development of defenses differs with the facts of each case, the Supreme Court in *Strickland*, "did not offer any special standards concerning the duty to investigate[.]" *Stevens v. Delaware Corr. Ctr.*, 295 F.3d 361, 371 (3d Cir.2002) (citing *Strickland*, 466 U.S. at 691, 104 S.Ct. 2052). It did, however, state that in all cases, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* (quoting *Strickland*, 466 U.S. at 691, 104 S.Ct. 2052).

As set forth above, Stevens identifies four pieces or types of evidence that he claims trial counsel either (i) possessed but failed to provide to mental health experts or otherwise failed to effectively use or (ii) failed to develop and then provide to the mental health experts. I will address each *seriatim*.

#### (1) The journal

After Stevens' arrest, the Commonwealth seized from his home a twenty-two page handwritten "journal" that had been kept by him prior to the murders. (*See* dkt. 32, PCRA Ex. I). At the PCRA hearing, he presented expert mental health evidence to establish that the journal reveals that at the time of the murders he was "szchizophrenic," disjointed," "un-der extreme emotional distress," "seriously mentally ill," "experiencing paranoid ideation," and was "psychotic." (Dkt. 16, App. 17 at 24; App. 22 at 16; App. 24 at 33–34, 45, 49).

Attorney Freeland received a copy of the journal from the Commonwealth, and he turned it over the to Public Defender's office, along with the rest of his file, when it assumed representation of Stevens. When Attorney Lipecky took over Stevens' case in March 1993, he reviewed the journal, and believed it reflected delusional thinking and perhaps contained evidence of psychosis. (*Id.*, App. 23 at 25–26). Stevens contends that, despite surmising that the journal contained useful information, Attorney Lipecky did not give it to the defense's mental health experts. In support he directs this Court to Dr. Landefeld's, Dr. Altman's, and Dr. Martone's PCRA hearing testimony, in which each testified that s/he did not see the journal prior to the PCRA proceedings. (*See id.*, App. 17 at 19–20; App. 22 at 14; App. 24 at 27, 35).

In analyzing the merits of this claim, it is necessary to recall an important point: only Dr. Altman and Dr. Landefeld served as the defense's mental health experts for the purpose of determining if Stevens had a mental health defense to the *charges* of murder. (Dkt. 16, App. 23 at 19; *see also* dkt. 30, App. 1, PCRA Ex. O). Dr. Martone was not retained by the defense until after the conclusion of the guilt phase. Thus, in reviewing whether Attorney Lipecky adequately prepared the mental health experts for the guilt phase, only his conduct with regard to Dr. Altman and Dr. Landefeld is relevant. Whether he provided Dr. Martone with the journal, as well as

---

but not the prejudice prong. After finding the state court's deficient performance decision unreasonable under § 2254(d)(1), *id.* at 2534–42, the Court turned to the prejudice prong.

It gave *de novo* review to the prejudice analysis, noting that its "review [was] not circumscribed by a state court decision with respect to prejudice." *Id.* at 2542.

the other information at issue here, is not probative of the adequacy of counsel's investigation into guilt-phase defenses.

With that point settled, I now consider Stevens' claim that Attorney Lipecky did not provide the journal to Dr. Altman and Dr. Landefeld. The PCRA court expressly rejected this contention and credited Attorney Lipecky's testimony to the contrary.[10] This Court is bound by that credibility determination. *See Rompilla,* 355 F.3d at 252–53; *Weeks v. Snyder,* 219 F.3d 245, 259 (3d Cir.2000). It must be presumed to be correct unless Stevens rebuts that presumption by clear and convincing evidence. *Id.* (quoting 28 U.S.C. § 2254(e)(1)).

■ Stevens has not met that burden. During the PCRA hearing, Attorney Lipecky testified that he talked to Dr. Altman about Stevens' journal and that as a result of their discussion, and at Dr. Altman's instructions, he hand delivered the journal to Dr. Landefeld. (Dkt. 16, App. 23 at 24–26, 110–116). The credibility of Attorney Lipecky's recollection was buttressed by a memorandum from him to Dr.

Landefeld, dated April 5, 1993, in which he stated:

Dear Ralph:

. . .

I am enclosing a 22 page document (?) which was taken from the defendant's residence by the Commonwealth as a result of a search warrant. I thought perhaps you would look at this to see if you can make something of it. If you need anything further, please call me[.]

s/ Wayne S. Lipecky.

(Dkt. 32, PCRA Ex. I). Thus, the PCRA court's finding of fact that Attorney Lipecky had discussed the journal with Dr. Altman and provided it to Dr. Landefeld is supportable by the PCRA testimony. Accordingly, this Court is bound by that determination. 28 U.S.C. § 2254(e)(1). As a result, there is no merit to Stevens' claim that his counsel was ineffective for not providing the journal to Dr. Landefeld and Dr. Altman.

■ As if anticipating that conclusion, Stevens next argues that Attorney Lipecky provided ineffective assistance because he did not "ensure" that the journal

**10.** Stevens asserts that the state courts did not find that any of the experts actually had the journal. (Dkt. 29 at 5 n. 7). That is not an accurate characterization of the PCRA court's findings. In considering the related claim of whether counsel provided ineffective assistance with regard to developing mitigating evidence, it determined:

[T]rial counsel made a substantial effort to develop mitigating evidence. This conclusion is supported by the following facts.

. . . .

Upon Lipecky's motion, Dr. Altman, a psychiatrist whose work Lipecky was familiar with, was appointed by Order dated March 9, 1993. According to Lipecky, he was engaged prior to the start of the trial for the purpose of evaluating Appellant's mental health status, both in terms of competency and as it was at the time of the shootings. Although the defense was also interested in mitigation, they initially want-

ed to focus on the possibility of a psychosis which could give him a defense.

. . . .

. . . Lipecky spent a considerable amount of time reviewing a lot of things with Dr. Altman, *including Appellant's handwritten notes [the journal.]* . . . Lipecky then consulted with Dr. Landefeld. Although Lipecky had his suspicions about the handwritten notes, he could not interpret it for purposes of diagnosing Appellant. Consequently, he hand-delivered them to Dr. Landefeld's office.

(Dkt. 17, App. 26 at 22–25) (emphasis in original) (internal citations omitted); *see also id.* at 27 ("[Attorney Lipecky] had given Dr. Altman information orally which included information contained in [Stevens'] handwritten notes. . . . He gave Dr. Landefeld's office [Stevens'] handwritten notes pursuant to Dr. Altman's request.")

was reviewed by the experts, ask them why it was not mentioned in their written reports, or otherwise question them about their conclusions regarding it. This argument has no merit. Attorney Lipecky admitted during the PCRA hearing that, after he had talked to Dr. Altman about the journal and hand delivered it to Dr. Landefeld's office, he did not ask either of them follow-up questions about it. His reasoning for that was simple: he had relied upon them to "to make whatever they could out of it." (Dkt. 16, App. 23 at 36). He "assumed that [the journal] was something that they had digested" and that they had reached their final diagnosis of Stevens after having reviewed it. (*Id.* at 44–45). His explanation provides a reasonable basis for his decision not to ask the experts any further questions about the journal. *Cf. Rompilla,* 355 F.3d at 253.

With the benefit of hindsight, Attorney Lipecky admitted that there would have been no harm in asking Dr. Landefeld and Dr. Altman follow-up questions about the journal. (Dkt. 16, App. 23 at 32–33). Nevertheless, I can hardly say that counsel was unreasonable because he failed to do so. Here, Attorney Lipecky reasonably assumed that Dr. Altman and Dr. Landefeld would have notified him if they determined that the journal was useful to the defense; after all, they were the experts. "[I]t is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel's was unreasonable." *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052. That is why *Strickland* creates "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* In the present case, Stevens has failed to come forward with evidence to overcome that presumption.

In sum, the state court determined that Attorney Lipecky did provide the journal to Dr. Landefeld and Dr. Altman, and there is amble evidence in the record to support that finding. Moreover, Attorney Lipecky exercised reasonable professional judgment when he relied upon Dr. Landelfed's and Dr. Altman's judgment to point out to him the journal's usefulness to the defense, if any.

**(2) Stevens' letters to Attorney Freeland**

■ Next, Stevens argues that Attorney Lipecky provided him with ineffective assistance because he failed to provide the experts with several letters sent by him to his first counsel, Attorney Freeland. (*See* dkt. 29 at 5). In one letter, dated August 2, 1992, Stevens wrote to Freeland that he believed Michael Love "fired a shot at me first[.]" (Dkt. 30, App. 1, PCRA Ex. BB). In a letter dated October 19, 1992, Stevens once again stated that Love shot at him, and also discussed his belief that Brenda Jo was involved in drugs and that the police were somehow involved in trying to protect her and Armando's alleged illegal activities. (*Id.,* PCRA Ex. CC). In another, undated letter, Stevens wrote to Freeland that he believed "there was a conspiracy to cause me harm." (*Id.,* PCRA Ex. DD). Stevens contends that the accusations contained in the letters were unsubstantiated and demonstrated paranoid and delusional thinking and should have been provided to the defense experts.

Attorney Lipecky acknowledged that he did not provide the actual letters to the defense experts. (Dkt. 16, App. 23 at 75–78). He did, however, testify that he verbally related the contents of the letters to them. (*Id.*) In addition, he arranged for both Dr. Altman and Dr. Landefeld to conduct clinical examinations of Stevens, thus providing each with the opportunity

to hear his client's delusional allegations for himself.[11] Based on all of the foregoing, Stevens has failed to meet his burden of establishing that his counsel was constitutionally deficient for not providing the actual letters to the defense experts. *Cf. Stevens v. Delaware Corr. Ctr.*, 295 F.3d at 371.

### (3) Stevens' complete institutional and employment records

■ The file that Attorney Freeland provided to the Beaver County Public Defenders Office contained Stevens' partial military and employment records. Although Attorney Lipecky provided those partial records to Dr. Altman, and Dr. Landefeld was aware of at least the partial military record's contents, Stevens argues that he nevertheless received constitutionally ineffective assistance because Attorney Lipecky did not seek and provide to

the experts full military and employment records. (*See* dkt. 29 at 5–6). He also argues that Attorney Lipecky provided him with deficient representation because he did not obtain and provide to the experts his school records. (*Id.*)

Stevens has failed to show that Attorney Lipecky's conduct was constitutionally deficient for not providing a complete set of the documents at issue to the defense experts. First, neither Dr. Altman nor Dr. Landefeld testified at the PCRA hearing that he felt that the partial military and employment records Attorney Lipecky provided were too incomplete to be reliable or useful.[12] Second, Stevens has failed to identify any additional, beneficial, relevant information that was contained in the complete military or employment records that was not contained in the partial records or of which the experts were not already aware.[13]

11. Dr. Altman's report indicates that he was well aware of the unsubstantiated claims that Stevens was making after the murders about his wife and Michael Love, and of the paranoia and delusional thinking evidenced in the letters. (*See* dkt. 30, App. 1, PCRA Ex. O). There, he noted that Stevens had told him about his belief that his wife was involved in drugs, that her alleged "numerous affairs were related someway to issues that he speculates but cannot be certain of[,]" and that he believed Love "pointed" a gun at him. (*Id.* at 1–3). He further detailed that Stevens "continues to have his story retold by himself in a paranoid and repetitive fashion, punctuated frequently with ideas of reference that his wife had been plotting against him.... He denied several times any past delusions or hallucinations but does tell me that he heard some type of voice telling him that the man who was dancing with his wife had a gun." (*Id.* at 6).

Dr. Landefeld's report also indicates that he was aware of Stevens' paranoia. (*See id.*, App. 1, PCRA Ex. H). He noted that Stevens related to him that he (Stevens) heard "people talking about him and his wife and 'who she is with.'" (*Id.* at 2). Dr. Landefeld also stated that Stevens projected onto others blame for his actions. (*Id.*)

12. In fact, Dr. Landefeld testified that it was "not unusual" to receive only partial military records. (Dkt. 16, App. 17 at 13).

13. The *partial* military records that Attorney Lipecky provided to the defense's experts contained information about Stevens' mental health history. In his April 15, 1993 report, Dr. Altman noted that those records revealed that Stevens had been hospitalized for psychiatric problems when he was in the Navy, had been anxious and possibly hallucinated, and was diagnosed at that time as having, among other things, a schizoid personality and emotional instability reaction. (Dkt. 30, App. 1, PCRA Ex. O). At most, the complete records would have served to "buttress" testimony concerning Stevens' already-identified depression, (*see*, dkt. 16, App. 17 at 14), and would have, in conjunction with some other collateral information first introduced at the PCRA hearing (including school records), indicated to them that a full battery of neuropsychological tests should be conducted. But, while a neuropsychological battery would have provided the defense with additional relevant expert mental health testimony for the sentencing phase, there is no evidence of record that, if such tests had been conducted, admissible

In sum, Stevens has failed to meet his burden of showing that his counsel's conduct on this point fell below Sixth Amendment standards. *See Rompilla,* 355 F.3d at 253–254 (holding that counsel did not act unreasonably in failing to provide certain school, medical, police and prison records to mental health experts where experts hired were highly qualified, performed their own tests and did not ask for such information and concluding that counsel's deference to expert was within the range of reasonable professional assistance); *Card v. Dugger,* 911 F.2d 1494, 1512 (11th Cir.1990) (same). However, even if Attorney Lipecky provided ineffective assistance on this point, this claim still fails because Stevens has not met his burden of showing that he was prejudiced at the guilt phase because the records at issue were not provided to the experts.

#### (4) Information from Stevens' family

Finally, Stevens argues that Attorney Lipecky provided him with constitutionally deficient assistance because he failed to develop his "social history" through interviews with his daughter, Karen Mangieri, and his sister Rosemary Postich, and also failed to interview his other sister, Constance Corbitt. According to Stevens, they could have provided the defense with information about his troubled childhood, difficult family life, and medical history, including a history of convulsions and head injuries.[14] (Dkt. 29 at 6).

I need not determine the merits of this claim. Even if Attorney Lipecky provided ineffective assistance in failing to develop information from Stevens' family members, this claim still fails because Stevens has not met his burden of showing that he was prejudiced at the guilt phase because of the alleged deficient performance.[15]

### 2. Prejudice

#### a. Standard of Review

The Supreme Court of Pennsylvania adjudicated the merits of *Strickland*'s prejudice prong. *Stevens II,* 739 A.2d at 514–16. According, this Court must apply

---

guilt-stage testimony from either Dr. Altman or Dr. Landefeld would have been secured.

As for the employment records, Stevens claims that they showed that he had a "history of unusual behavior." (Dkt. 29 at 6). However, he has failed to direct this Court to any evidence that establishes that the employment records are in any way relevant to his claims. During the PCRA hearing, Stevens' counsel showed Dr. Altman his client's employment records, but Dr. Altman did not identify anything in the records that would have informed or affected his evaluation. (Dkt. 16, App. 24 at 86–87).

**14.** Stevens also faults Attorney Lipecky for not providing a copy of Attorney Freeland's notes to the defense experts in which Freeland had jotted down several things, including: "Convulsions when infant-died," and "Battered husband syndrome." (*See* dkt. no. 32, PCRA Ex. Z). Stevens argues that the reference to convulsions was important and that the doctors should have been made

aware of it. Attorney Lipecky provided a reasonable basis for not providing the note to the experts: he testified that when he reviewed the note, it was his impression that it was a reference to the charges Stevens was making about his wife abusing his daughter and grandchild-charges of which the experts were already aware. (Dkt. 16, App. 23 at 88). In any event, even if Attorney Lipecky should have provided the note to Dr. Altman and Dr. Landefeld, Stevens cannot show that he was prejudiced at the guilt phase of the trial for his counsel's failure to do so.

**15.** The Court in *Strickland* noted that although it had discussed the performance component of an effectiveness claim prior to the prejudice component, there is no reason for an analysis of an ineffectiveness claim to proceed in that order. 466 U.S. at 697, 104 S.Ct. 2052. Consequently, if it is more efficient to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, this course should be followed. *Id.*

§ 2254(d)(1)'s standard or review to that portion of the analysis.

### b. Legal Analysis

 In rejecting this part of Stevens' claim, the Supreme Court of Pennsylvania relied upon Judge Kunselman's determination that he, as the factfinder in Stevens' non-jury guilt trial, "would have still concluded that [Stevens] had the capacity to form the specific intent to kill at the time of the murders[,]" notwithstanding the evidence presented at the PCRA proceeding. *Id.* at 516. Stevens argues that the Supreme Court of Pennsylvania's decision on this point was "contrary to" *Strickland* under § 2254(d)(1) because its analysis was based upon an outcome determinative test, relying solely upon the "proclivities" of Judge Knuselman. (Dkt. 7 at 7–8).

Stevens' argument is one the merits of which I need not decide. Even if I accept it and conclude that the state court's reliance upon Judge Knuselman's "proclivities" was "contrary" to *Strickland* under § 2254(d)(1), this claim still fails because he has failed to show-even under a *de novo* review-that his constitutional rights were violated, *i.e.*, that he suffered prejudice as a result of his counsel's alleged ineffective assistance.[16]

Two reasons undergird my decision. First, the evidence that Stevens offers in support of his claim does not establish that, had Dr. Altman and Dr. Landefeld had the information he claims his counsel failed to develop, they would have been able to offer any admissible evidence during the guilt phase on the defense of diminished capacity. Second, there was overwhelming evidence of specific intent to kill, such that Stevens has failed to show that there is a reasonable probability that the outcome of his proceeding would have been different. *See Strickland,* 466 U.S. at 694, 104 S.Ct. 2052.

Dr. Altman testified at the PCRA hearing that if he would have had all the information at issue here when he was evaluating Stevens prior to trial, he would have directed that the defense secure "more data to clarify" if Stevens was psychotic and/or suffered from organic brain damage. (Dkt. 16, App. 24 at 36–37). To gather that data, Dr. Altman explained that he would have insisted that Stevens receive a neuropsychological battery of tests, as opposed to just the general psychological screening tests that Dr. Landefeld conducted.[17] (*Id.* at 36–37, 41–45, 58, 61–63, 74–75, 88).

Following that lead, at the PCRA hearing Stevens presented the testimony of Dr. Carol Armstrong, who conducted the full neuropsychological testing battery that Dr. Altman testified Stevens should have received prior to his trial. Dr. Armstrong testified that the results of her testing established that Stevens had dysfunction of the right frontal area of his brain, had

---

16. *See Aleman v. Sternes,* 320 F.3d 687, 690 (7th Cir.2003) (If state court's opinion was "contrary to" Supreme Court law under 28 U.S.C. § 2254(d), that section no longer applies; but, petitioner still must establish an entitlement to the relief he seeks under § 2254(a): that he is "in custody in violation of the Constitution or laws or treaties of the United States."), *cert. denied,*—— U.S. ——, 123 S.Ct. 2653, 156 L.Ed.2d 659 (2003); *Gibbs v. VanNatta,* 329 F.3d 582, 584 (7th Cir.2003) (the petitioner "is not entitled to relief in the federal courts unless he can show that he was in fact denied effective assistance of counsel, not merely that the state courts bobbled the issue.")

17. Dr. Landefeld testified that he performed a psychological screening, as opposed to recommending that a neuropsychologist conduct a battery of tests, because at the time he had no evidence that would have indicated the presence of a possible neurological problem. (Dkt. 16, App. 17 at 9).

severe psychological impairment, psychosis, and was under a tremendous amount of emotional distress at the time of the murders. (*Id.*, App. 20 at 12–16, 36, 45).

Dr. Altman explained that the results of Dr. Armstrong's testing established that Stevens had organic brain damage. (*Id.*, App. 24 at 90). Based upon his review of the results of Dr. Armstrong's tests and her report, the journal, and the affidavits of Stevens' daughter and sisters, Dr. Altman testified that he would have been able to provide the following testimony at the sentencing hearing to support the following mitigating factors: that Stevens suffered from delayed development as a child, had sustained head injuries, grew up in a dysfunctional family, suffered from duress at the time of the murders, had a genetic tendency towards alcoholism, was under the influence of extreme mental and emotional disturbance at the time of the murders, and that his capacity to conform his conduct to the requirements of the law was substantially impaired at the time of the offenses. (*Id.* at 96–97).

■ Thus, while Dr. Altman's revised diagnosis of Stevens would have been rele-

vant for the purpose of establishing mitigating factors during the sentencing phase of the trial, Stevens has failed to show that it would have been relevant and admissible during the guilt phase. The Third Circuit has noted that: "Pennsylvania case law established that [at the time of Stevens' trial], to prove diminished capacity, only expert testimony on how the mental disorder affected the cognitive functions necessary to form the specific intent [to kill] is relevant and admissible." *Zettlemoyer,* 923 F.2d at 295 (citing *Commonwealth v. Terry,* 513 Pa. 381, 521 A.2d 398, 404 (1987); *Davis,* 479 A.2d at 1080). "Evidence that the defendant lacked the ability to control his actions or that he acted impulsively will not establish diminished capacity." *Stevens II,* 739 A.2d at 515 (citing *Commonwealth v. Travaglia,* 541 Pa. 108, 661 A.2d 352, 359 (1995)). Importantly, Dr. Altman never stated (and in fact was never asked by Stevens' PCRA counsel) that, after considering the information at issue, he would have been able to testify at the guilt phase that Stevens' impairments affected his ability to formulate the specific intent to kill.[18] *Compare*

---

18. At the PCRA hearing, Dr. Martone testified that if she would have been provided with the journal and the collateral information provided by Stevens' family members, she would have diagnosed Stevens as having been psychotic at the time of the murders. (Dkt. 16, App. 22 at 41–42). She also testified that if counsel had retained her for the purpose of the guilt phase of the trial she would have been able to provide testimony relevant to a diminished capacity defense because, in her opinion "when someone is that psychotic they lack the mens rea to form the intent." (*Id.*) Stevens relies heavily on her testimony, and indeed so did the state courts. That reliance is misplaced. She was working for the Commonwealth when she made her first diagnosis of Stevens in August 1992, and she was not retained by the defense until after the conclusion of the guilt phase of the trial.

Attorney Lipecky retained Dr. Altman for the purpose of developing guilt-phase mental

health defenses. (*See e.g.,* dkt. no. 16, App. 23 at 108). He thus secured for Stevens the expert assistance to which he was entitled for the guilt phase, *see Ake v. Oklahoma,* 470 U.S. 68, 83, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), and Stevens does not fault him in that regard. The issue here, then, is what would Dr. Altman, with the benefit of the new information he reviewed for the PCRA proceedings, have testified to during the guilt trial if counsel had not provided the alleged ineffective assistance? Stevens failed to develop testimony from Dr. Altman that he would have been able to testify that, in his expert opinion, Stevens lacked the ability to form the specific intent to kill. (*See* dkt. 16, App. 24 at 22–24). Under *Strickland,* it is the petitioner, and no one else, who has the burden to prove all facts in support of his claim. Stevens has not met that burden.

*Commonwealth v. McCullum*, 558 Pa. 590, 738 A.2d 1007, 1010 (1999) (expert witness made no mention of appellant's cognitive functions of deliberation and premeditation at the time of the murder or his ability-or inability-to formulate the specific intent to kill; testimony would not have been admissible at trial to support diminished capacity defense); *Commonwealth v. Blystone*, 555 Pa. 565, 725 A.2d 1197, 1207 (1999) (since neither of the experts "testified that [Blystone's] alleged impaired cognitive functions in any way affected his ability to formulate the specific intent to kill[,]" "their testimony was irrelevant with regard to a diminished capacity defense during the guilt phase[.]"); *with Commonwealth v. Legg*, 551 Pa. 437, 711 A.2d 430, 433 (1998) (the petitioner's expert testified that due to her depression and anxiety, she lacked the ability to rationally formulate the intent to kill; noting that expert's "testimony spoke to more than an inability of [petitioner] to control herself, *and directly related [her] underlying mental defect to her inability to formulate a specific intent to kill.*")

In any event, the evidence of specific intent to kill that the Commonwealth presented at the guilt phase of the trial was so strong that Stevens has not satisfied his burden of establishing that there is a reasonable probability that the outcome of the guilt phase of his trial would have been different if counsel had done all of the things for which he now faults him. *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. The *Zettlemoyer* court noted that, under Pennsylvania law, "[e]vidence of specific intent to kill may disprove the defense of diminished capacity." 923 F.2d at 295–96

(citing *Commonwealth v. Tempest*, 496 Pa. 436, 437 A.2d 952, 955 (1981)). Accordingly, it determined that even if the petitioner in that case had established that his counsel was constitutionally deficient for failing to develop evidence to support a diminished capacity defense, his claim of ineffective assistance still failed because of the "overwhelming evidence demonstrating [his] specific intent to kill[.]" *Id.* at 297. That same reasoning applies here.

■ Stevens admitted during the guilt phase of his trial that he left Armando's bar the night of the murders, retrieved his gun from his car, cocked it three times, and then reentered the bar.[19] (Dkt. 13, App. 2 at 343, 365, 530–31). He stood near the dance floor and waited for Love and his wife to finish dancing. (*Id.* at 343, 365). When they walked away from each other, he approached his wife, pressed the gun to the back of her head and shot her. (*Id.* at 227–28, 366). He then turned to Love-who had raised his arms in the air-and shot him twice in rapid succession. (*Id.* at 551). He shot Love several more times while Love lay on the floor, including an intentional shot to his scrotum area. (*Id.* at 377, 557–59, 561). After shooting Love, he then refocused on his wife, who lay lifeless on the floor. He shot her again in the head and he admitted that he had intentionally aimed at her back.[20] (*Id.* at 559).

Considering all of this evidence, I conclude that-regardless of whether the defense would have proceeded before the judge or opted to have the case tried before a jury-the outcome of Stevens' guilt

19. In order to fire his gun, it had to be cocked, which Stevens did. (*Id.* at 444). The type of bullet he used was a hollow-pointed bullet, which, upon impact, expands and explodes, and is used to inflict serious injury. (*Id.* at 446–47).

20. Under Pennsylvania law, "[d]ischarging a deadly weapon aimed at a vital part of the body demonstrates specific intent to kill." *Zettlemoyer*, 923 F.2d at 297 (citing *Commonwealth v. Davis*, 479 A.2d at 1080).

phase would have been the same: guilty on two counts of first-degree murder. *See Zettlemoyer*, 923 F.2d at 297–98. Accordingly, Stevens has failed to show that there is a reasonable probability that, even if counsel's conduct was deficient, the result of his guilt proceeding would have been different. *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052.

Moreover, because Stevens has not made a "substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), I will also deny him a certificate of appealability on this claim.[21]

### CONCLUSION

Since 1993, Andre Stevens has challenged his convictions and death sentences on appeal and in state post-conviction proceedings. Today, I confirm the reliability of his convictions, but vacate his death sentences. Stevens was sentenced before a jury that was improperly death qualified. For these reasons, his death sentences cannot stand.

Within 180 days of the entry of my Order in this case, the Commonwealth may conduct a new hearing on whether Stevens should be sentenced to death for the first-degree murders of Brenda Jo Stevens and Michael Love. If the Commonwealth chooses not to conduct such a hearing, it shall sentence him to life in prison in accordance with the laws of the Commonwealth.

An appropriate Order follows.

### ORDER

AND NOW this 26th day of May 2004, upon consideration of The Petition for Writ of Habeas Corpus and the complete record in this case, it is hereby ORDERED and DIRECTED that:

1. To the extent that Petitioner seeks relief from his convictions for first-degree murder, his petition for habeas corpus relief is DENIED;

2. To the extent that Petitioner seeks relief from his sentences of death, his petition for habeas corpus relief is GRANTED;

3. The execution of the writ of habeas corpus is STAYED for 180 days from the date of this Order; during which time the Commonwealth of Pennsylvania may conduct a new sentencing hearing;

4. After 180 days, should the Commonwealth of Pennsylvania not conduct a new sentencing hearing, the writ shall issue and the Commonwealth shall sentence Petitioner to life imprisonment;

5. In accordance with 28 U.S.C. § 2253(c)(2) and W.D. Pa. Local R. 9.4(L), a certificate of appealability is DENIED on Petitioner's guilt-phase claim;

6. If either party files an appeal to the United States Court of Appeals for the Third Circuit, this Order will be stayed pursuant to W.D. Pa. Local R. 9.4(L);

7. The Clerk of Court shall mark this CASE CLOSED.

---

21. In order to make a "substantial showing of the denial of a constitutional right" under 28 U.S.C. § 2253(c)(2), Stevens must "demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller–El*, 537 U.S. at 327, 123 S.Ct. 1029.